**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
......................................................................X
HATTERAS ENTERPRISES, INC., a
California Corporation; MADMACK LLC, a
California Limited Liability Company; and
DEBRA MATTES, an individual,

                      Plaintiffs,

      - against -


FORSYTHE COSMETIC GROUP, LTD;
HARRIET ROSE 2009 IRREVOCABLE
TRUST; HARRIET ROSE, an individual; and
MICHAEL ROSE, an individual,

                   Defendants.
......................................................................X

**MEMORANDUM AND
ORDER**

15-CV-5887 (GRB)(JMW)

**FILED
CLERK**

2:43 pm, Aug 25, 2022

**U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE**

**GARY R. BROWN, United States District Judge**:

      Plaintiffs Hatteras Enterprises Inc. ("Hatteras"), Debra Mattes ("Mattes"), and MadMack

LLC ("MadMack") brought this action against the defendants Forsythe Cosmetic Group, Ltd.

("Forsythe"), Harriet Rose 2009 Irrevocable Trust (the "Trust"), Harriet Rose, and Michael Rose

alleging, *inter alia*, fraud and breach of contract arising out of a 2012 agreement for the rights to

plaintiffs' color-changing nail polish.   Before this Court is defendants' motion for summary

judgment.   For the reasons set forth below, defendants' motion is DENIED in part as to fraudulent

inducement, securities fraud under Cal. Corp. Code § 25401, and aiding and abetting fraud, but is

otherwise GRANTED.

      *Facts*

      The following facts from defendants' Rule 56.1 statement, plaintiffs' counterstatement,

and other record evidence are recounted in the light most favorable to plaintiffs, the non-moving

party.  *Ayazi v. United Fed'n of Teachers Loc. 2*, 487 F. App'x 680, 681 (2d Cir. 2012) ("when

1

assessing a summary judgment motion, a District Court 'may consider other materials in the record.'").

Mattes is the CEO of Hatteras, d/b/a Solar Active, and the manager of MadMack.  Docket Entry ("DE") 109-1, R56.1 Counterstatement, ¶¶ 5, 7.  In or around 1990, Mattes developed a nail polish that changes color when exposed to sunlight and marketed the nail lacquer under her brand "Blaze."  *Id.* ¶¶ 8–9.  By 2010, sales of the photochromic nail polish reached nearly $50,000.  *Id.* ¶ 11.  In late 2011, Forsythe's former president Michael Rose called Mattes about a potential private label deal with Mattes' innovation.  *Id.* ¶¶ 4, 13.  Mattes told Michael Rose that she had been offered the opportunity to license the color-changing nail polish to another cosmetics company, Orly, for a 20% royalty.  *Id.* ¶ 14; *see* DE 109-8, Decl. of Orly CEO Jeff Pink.  Michael Rose told Mattes not to consider the deal with Orly because she could be making more money as a 50% partner in a joint venture with Forsythe.  DE 109-6, Mattes Decl. 1/6/22, ¶ 2; DE 109-4, Mattes Decl. 1/10/21, ¶ 2.  He told her Forsythe was larger than Orly, and second only to OPI, the largest nail polish company in the industry.  DE 109-6, ¶ 2.

In January 2012, Mattes travelled to New York to meet with Michael Rose and his mother Harriet Rose, one of Forsythe's founders.  DE 109-1, ¶ 18.  At the meeting, Michael and Harriet Rose made a number of representations:

- Forsythe was a $34 million company.  DE 109-4, ¶ 4.

- In a joint venture with Forsythe, Mattes would have equal say in the management and supervision of the company.  Mattes would sell the nail polish to retail customers, approve nail polish colors, and contribute to the marketing and advertising campaigns.  *Id.*

- Hatteras could sell the nail polish through its current distribution and sell the nail

2

polish on the SolarActive website.  *Id.*

- Mattes would have an absolute right to inspect the books and records of the new entity, including Forsythe's overhead and operating expenses and revenue to verify the financials.  *Id.* ¶ 5.

- Forsythe would manufacture and fulfill a two million bottle order from the cosmetic company Avon.  *Id.*

- Michael Rose confirmed he had a large order from the cosmetics company Amway. *Id.*

- Singer-songwriter Taylor Swift had agreed to be the spokesperson for the color-changing nail polish and celebrity Lady Gaga would wear the nail polish at an upcoming fashion show.  *Id.*[1]

Following the meeting, Michael Rose sent Mattes an email stating, "We are really excited to joint venture with you.  It will be incredible."  DE 87-9.  The new nail polish created by this joint venture was to be named "Ruby Wing."  DE 64, Second Amended Complaint ("SAC") ¶ 25. Mattes returned to California and retained a lawyer to negotiate the terms of the proposed partnership with Forsythe.  DE 109-4, ¶ 8.  At home, Mattes conducted online research about Forsythe, but did not ask for any documents or financial records.  DE 108-6, Mattes Depo. at 136–37.

That a deal with Taylor Swift had not materialized by early 2012 caused Mattes little concern because the product had not yet launched.  DE 109-1, ¶ 44.  "You can't be a spokesperson until you have something that's going on the market, there was nothing to speak about," Mattes noted. *Id.*  Mattes had not seen any marketing materials featuring Swift and did nothing to confirm

---

[1] Mattes' then-boyfriend Corey Ingber, an attorney who also attended the meeting, corroborates these representations.  DE 109-7, Decl of Corey Ingber.

whether Swift was in fact the spokesperson. *Id.* ¶ 43. However, in January 2012 Mattes sent Michael Rose a photo of a color-changing bracelet, a product Swift had purportedly agreed to promote. DE 109-6 at 5-6, 30-32, Ex. 9. Michael Rose forwarded her an email from a Swift representative regarding the products and said it "looks like the quantity will be 10 million[.]" The Swift representative said they were "waiting to hear from the lawyer to finalize all of the trademarking." *Id.* at 34-35, Ex. 10.

Around this time, Michael Rose also gave Mattes the pricing for the $2 million deal with Avon, which was contingent upon the cost of manufacturing. DE 109-1, ¶ 22. In February 2012, Avon told Mattes that the price was "too high . . . even though there was interest for the concept[.]" DE 108-38, Ex. JJ. The large order from Amway also never materialized. DE 109-1, ¶ 96. Michael Rose does not know when they lost their business account with Amway, but guesses it was "sometime prior to 2012." DE 108-9, Michael Rose Depo. at 48:16-25.

In April 2012, the parties circulated a Term Sheet outlining the terms of the new enterprise, Solar Club LLC ("Solar Club"):

- Both Forsythe and Mattes would own a 50% membership interest in Solar Club;

- Forsythe would be the managing member;

- Hatteras would contribute to Solar Club: (i) the formula for light-sensitive nail polish and related nail products, (ii) the BLAZE website, customer base and IP, (iii) Solar Active testing knowledge and documentation, and (iv) the registered trademark SOLAR ACTIVE, Registration No. 76978078;

- Forsythe would enter into a Services Agreement with Solar Club pursuant to which Forsythe would provide administrative and operational support to Solar Club in exchange for 30% of Solar Club's adjusted gross revenue, subject to revision at 6-

4

month intervals;

- If either member disputed the accuracy of the applied percentage, it could engage, at its own expense, an independent accounting firm to examine the calculations performed by Forsythe's accountants, Rosen & Federico, and consult with Robert Rosen with respect thereto at his office.

DE 109-1, ¶ 30; DE 108-12, Ex. J, Revised Term Sheet.

Mattes read all of the various drafts of the term sheets and did not ask her lawyer any questions because the term sheets were "pretty clear cut."  DE 108-6, Mattes Depo. at 157–58. Although the April 2012 Term Sheet omits many of the representations previously made to Mattes regarding the degree of control she would have in the new company and her auditing rights, according to Mattes the terms of the joint venture were in their "oral agreement."  DE 109-1, ¶ 31. Shortly after the April 2012 Term Sheet was circulated, Harriet Rose sent Mattes an email stating "I am so happy to partner with you."  DE 109-6 at 27, Ex. 7.  Until June 2012, Mattes worked "side-by-side" with the Roses on everything from Facebook posts to testing new nail polish colors. DE 109-1, ¶¶ 33, 35.

In June 2012, the parties executed six agreements in a "step transaction" establishing the new business relationship between the parties:

- License Agreement: Hatteras licensed the nail polish to MadMack for 50 years in exchange for a 5% royalty.  DE 108-15, Ex. M.

- Assignment and Assumption Agreement: MadMack, in turn, granted its license to SolarClub, LLC.  DE 108-18, Ex. P.

- Operating Agreement: MadMack and the Harriet Rose 2009 Irrevocable Trust created a new entity, Solar Club, LLC, in which both parties had a 50% stake.  DE

108-16, Ex. N.  The manager, Forsythe, has "full authority, power and discretion to make all decisions with respect to the Company's business[.]"  Sections 5.1(a), 5.2.

- Services Agreement: In exchange for serving as Solar Club's manager, Forsythe received 30% of Solar Club's adjusted gross revenue, subject to revision at six-month intervals (the "Administrative and Operations Fee").  DE 108-17, Ex. O.

- Loan Agreement: Forsythe may advance funds to Solar Club at an interest rate of prime plus one percent.  DE 108-19, Ex. Q.

- Security Agreement: Solar Club pledged all its assets, including intellectual property rights, as security for its repayment obligations under the Loan Agreement.  DE 108-20, Ex. R.

Numerous clauses within the foregoing contracts are relevant to instant motion.  Although the recitals to the License Agreement state that "pursuant to the oral agreement between the parties . . . representatives of the Licensee have met and discussed a proposed co-venture with a third party located in New York," DE 108-15 at 3, Section 18(b) says, "[t]he relationship between the parties hereto is that of Licensor and Licensee, and this Agreement is not to be construed as creating a partnership, joint venture, principal-agent or other relationship for any purpose whatsoever."  The integration clause states, "[t]his Agreement constitutes the entire agreement and understanding of the parties hereto concerning the subject matter thereof.  No representations, warranties, understandings, inducements, promises, guarantees, agreements and/or conditions, whether written, oral or both, not expressly contained herein, have been made or shall be enforceable by either party concerning the subject matter hereof or any relationship between the parties hereto."  Section 18(a).

The License Agreement also contains several requirements regarding marketing and use of the License.  **"**Whenever the Licensed Trademark is used in advertising or in any other manner, Licensee shall clearly identify Licensor as the trademark owner to the extent practicable."  Section 5(b).  In addition, "Licensee shall submit three samples of each label, packaging, literature, promotion, and advertisement . . . for review and approval [by Licensor] before the release of such materials."  Section 5(a).  Finally, Licensee must use "reasonable efforts" to promote the Licensed Trademark.  Section 5(b).  Notwithstanding these obligations, the Agreement contains a limitation of liability clause: "In no event will either party be liable to the other for any special, incidental, consequential, lost profits or indirect damages of any kind arising in any way out of this agreement, however caused and on any theory of  liability, even ifthe [sic] other party has been advised of the possibility of such damages[.]"  Section 14(a).

The Operating Agreement contains an exculpatory clause for the manager, Forsythe. Section 5.4 states, "The Manager shall perform his/her/its duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances." DE 108-16, Ex. N.  However, "[a] Manager shall not be liable to the Company or to any Member for any loss or damage unless a judgment or other final adjudication adverse to the Manager establishes that such loss or damage was the result of fraud, gross negligence, willful misconduct, bad faith or a wrongful taking by the Manager."  *Id.*

Under the Servicing Agreement, every six months Forsythe's independent accounting firm, Rosen & Federico, computes the combined expenses incurred by Forsythe and Solar Club and delivers a report of the resulting Administrative and Operations Fee.  DE 108-17, Section 6(a)(i). If a member disagrees, the objecting party may, at their expense, hire an independent accounting firm to recalculate the Administrative and Operations Fee.  Section 6(a)(ii).  For the purpose of

such review, the independent accounting firm shall be given access to and may review the calculations performed by Rosen & Federico.  *Id.*  Since the Administrative and Operations Fee is applied retroactively to the six-month period preceding the date of adjustment, Solar Club must pay Forsythe if the fee is adjusted upward.  Section 6(a)(iv).

Mattes alleges "everything changed" after the six June 2012 contracts were signed.  DE 109-1, ¶ 81.  Suddenly, the Roses no longer wanted Mattes involved in the business.  *Id.*

After Mattes received the first Solar Club tax return in 2013, she realized that Forsythe is not a $34 million company.  DE 109-4, ¶ 10.  Based on 2013 and 2014 tax returns, plaintiffs' expert witness Jay Abrams, CPA found Forsythe was "not close to being a $34 million dollar company."  DE 109-10, ¶ 9(a).  Instead, its sales for fiscal year 2013 were merely $11.7 million, and sales for fiscal year 2014 were only $15.8 million.  *Id.*

According to Michael Rose, Solar Club had almost a million dollars in sales in its first full year of operations.  DE 109-1, ¶¶ 49-50.  Mattes was paid the 5% royalty pursuant to the License Agreement and received statements regarding the royalty payment calculation on a regular basis.  DE 109-1, ¶¶ 52-53.  Likewise, Solar Club paid Forsythe the Administrative and Operations Fee which was adjusted every six months pursuant to the Services Agreement, and Forsythe's accountant Robert Rosen sent an email identifying the combined revenues and expenses and the new fee.  DE 109-1, ¶ 57.  However, Rosen never provided the "backup files" substantiating the revenues and overhead expenses of Forsythe and Solar Club.  *Id.*

Mattes soon became suspicious of the expenses Forsythe reported.  In a June 2013 email, for instance, Mattes asked Rosen to "explain how there was $76,321.00 was [sic] paid out for marketing, advertising and internet in a six month period when we didn't launch RW until the end of July."  DE 109-10 at 7.  In July 2013, Harriet Rose instructed Mattes not to contact Rosen

directly, but instead have her accountant contact theirs.  DE 109-1, ¶¶ 56, 88; DE 87-11.  In March 2017, Mattes retained an accountant to perform an independent accounting of the Administrative and Operations Fee.  Forsythe offered to make Rosen available for the independent accounting, but Mattes' accountant passed away before completing the work.  DE 109-1, ¶ 64.  According to Rosen, no accountant ever approached him on behalf of Mattes regarding the calculation of the Administrative and Operations Fee.  DE 110-1, Decl. of Robert Rosen, ¶ 6.  Plaintiffs' expert Abrams calculates that the administrative fee exceeded 30% in 2014, 2016, and 2017.  As a result, Forsythe received at least 87.1% of the adjusted net income, and Mattes received 12.9%.  DE 109-10, ¶ 4.  Thus, with the administrative fee, the "50-50" partnership effectively became less than "80-20."  *Id.*

According to plaintiffs, Forsythe did not use the licensed trademark in promoting the licensed products for 18 months and only recently used it in online advertising.  DE 64, SAC, ¶ 35.  In support, Mattes submits images of the Ruby Wing nail polish on which defendants failed to affix the Solar Active trademark.  DE 109-6, ¶ 17, at 76, Ex. 22.  Plaintiffs also dispute defendants' efforts to market the color-changing nail polish.  In 2012, Solar Club paid $60,000 for marketing expenses even though the marketing effort for Solar Club was "minimal" since they only went to one trade show.  DE 109-6, ¶ 11.  The Secretary and Treasurer of Forsythe disputes this, saying Ruby Wing was displayed at three trade shows.  DE 110-2, ¶¶ 7-10.  Michael Rose testified that he "tried to really build the business . . . we did all the trade shows, we complied with everything [Mattes] asked."  DE 109-1, ¶ 49.  According to Mattes, the Ruby Wing website has not been updated since 2014, and the Facebook page has not been updated since 2013.  DE 109-6, ¶ 9.  Although defendants claim there is no demand for the product, Mattes receives hundreds of Google Alerts for the product each year.  DE 109-6, ¶ 10.

According to plaintiffs' expert, the present value of "[p]laintiffs' damages based on what they should have received in royalties and their share of the profits of [Solar Club] had the Defendants acted in good faith, with diligence and competence, minus what she actually received" from 2012–2027 business operations is $90,989,625 as of December 31, 2022.  DE 109-9 at 16.  Alternatively, the present value of total damages based on what plaintiffs would have received in royalties had the deal with Orly taken place is $139,421,643.  *Id.*

In 2014, Mattes sued her attorney in California state court, alleging she failed to advise her that the contracts gave Forsythe complete control over Solar Club.  DE 109-1, ¶ 66; DE 108-30.  The case is currently stayed.  DE 109-1, ¶ 84.[2]

*Procedural History*

Plaintiffs commenced this action in California state court in January 2015 and filed an amended complaint in April 2015.  *Hatteras Enterprises Inc. v. Forsythe Cosm. Grp., Ltd.*, No. 2:15-cv-05887(ADS)(ARL), 2018 WL 1935984, at *3 (E.D.N.Y. Apr. 23, 2018).  In June 2015, defendants removed the case from California Superior Court to the United States District Court for the Central District of California on the basis of diversity jurisdiction.  *Id.*  In August 2015, the Central District of California transferred the case to the Southern District of New York, which then transferred the case to the Eastern District of New York in light of the forum selection clause in the parties' contracts designating Nassau County as the sole and proper venue for any judicial

---

[2] In opposition to defendants' motion for summary judgment, Mattes raises a number of new allegations not mentioned in the complaint.  First, Mattes asserts that Michael Rose sexually harassed her by calling her his "girlfriend" and telling her he "dream[ed] about [her]" and "want[ed] to f… you."  DE 109-1, ¶ 87.  Second, she alleges that defendants refused to enter into a partnership with Coty/OPI, the largest manufacturer of nail polish.  DE 109-6, ¶ 12.  Third, Mattes asserts that defendants interfered with her exclusive supplier agreement with PPG.  DE 109-1, ¶ 95.  The Court declines to consider these new theories of the case presented for the first time on summary judgment.  "It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment."  *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) (rejecting new theory of excessive force claim that was raised for the first time in plaintiff's opposition to defendants' motion for summary judgment) (citing *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (summary order)).

proceeding.  *Id.*; DE 108-15, Ex. M at 21, Section 18(g).

In April 2018, this Court dismissed without prejudice plaintiffs' statutory and common law claims for fraud, as well as the request for rescission based on fraud.  However, the Court denied defendants' motion to dismiss as to plaintiffs' claim for breach of contract, breach of the confidentiality agreement, request for injunctive relief, accounting, and constructive trust. *Hatteras Enterprises Inc*, 2018 WL 1935984, at *11, *13.  After conducting a thorough choice of law analysis, Judge Spatt held that New York law applied to the fraud claims and the requests for specific performance, injunctive relief, accounting, constructive trust and recission of the six 2012 contracts.  *Id*. at *6, 9.  California law applied to the plaintiffs' statutory securities fraud claims. *Id.* at *9.

In May 2018, plaintiffs filed a motion to amend the complaint.  DE 55.  In January 2019, the Court granted in part plaintiffs' motion to amend.  *Hatteras Enterprises, Inc. v. Forsythe Cosm. Grp., Ltd.*, No. 2:15-CV-05887(ADS)(ARL), 2019 WL 9443845, at *10 (E.D.N.Y. Jan. 14, 2019). In January 2019, plaintiffs filed an amended complaint consistent with the Court's Order, asserting the following claims:

- Count One – Breach of an April 2012 joint venture agreement between Forsythe, Michael Rose, Harriet Rose, the Trust, Hatteras and Mattes;

- Count Two – Breach of fiduciary duty-joint venture/partnership by Hatteras and Mattes against Forsythe, Michael Rose, Harriet Rose, and the Trust;

- Count Three – Breach of the License Agreement and Assignment and Assumption Agreement;

- Count Four – Breach of fiduciary duty brought derivatively by MadMack on behalf of Solar Club against Forsythe;

- Count Five – Breach of the Services Agreement brought derivatively by MadMack on behalf of Solar Club against Forsythe;

- Count Six – Conversion;

- Count Seven – Fraudulent inducement;

- Count Eight – Securities fraud violation of California Corporations Code § 25401, *et seq.* by MadMack against all defendants;

- Count Twelve – Accounting;

- Count Thirteen – Imposition of a Constructive Trust;

- Count Fourteen – Aiding and Abetting Fraud.[3]

DE 64. A pre-motion conference was held in January 2021, DE 89, and discovery was certified as complete in October 2021 following the resolution of a discovery dispute over the production of certain financial records. *See* DE 101, 103. Defendants moved for summary judgment in February 2022. DE 108-10.[4]

*Standard of Review*

This motion for summary judgment is decided under the oft-repeated and well-understood standard for review for these matters, as discussed in *Bartels v. Inc. Vill. of Lloyd Harbor*, 97 F. Supp. 3d 198, 211 (E.D.N.Y. 2015), *aff'd*, 643 F. App'x 54 (2d Cir. 2016), which discussion is incorporated by reference herein. In sum, the question before the Court is whether, based upon

---

[3] Plaintiffs abandoned Counts Nine (Breach of Confidentiality Agreement), Ten (Specific Performance of Confidentiality Agreement), and Eleven (Injunctive Relief). DE 87 at 2.

[4] Defendants filed a counterclaim, demanding attorneys' fees and costs for breach of the mediation and arbitration provisions in the June 2012 contracts, DE 68, ¶¶ 109-12, unjust enrichment claims arising out of the improper distribution of the 5% management fee, DE 68, ¶¶ 113-17, and outstanding expenses reasonably incurred in connection with the performance of the Services Agreement. DE 68, ¶¶ 118-20. As defendants do not request judgment on the counterclaims, the counterclaims are not addressed in this opinion.

the undisputed or improperly disputed facts, the defendants are entitled to judgment.  It is with this standard in mind that the Court turns to the motions at bar.

*Counts One and Two – Breach of the Joint Venture Agreement and Fiduciary Duty*

Count One asserts defendants breached the joint venture/partnership by: (i) refusing to conduct a six-month review of the operating percentages charged by Forsythe; (ii) refusing to allow Mattes to participate in the operations of Solar Club; (iii) denying plaintiffs' right to audit the books and records of Solar Club; and (iv) denying Mattes the right to equal operation of the new joint venture entity.  DE 64, SAC ¶ 26.

"In order to properly plead a joint venture, a party must plead four essential elements: (1) a specific agreement manifesting the intent of the parties to be associated as joint venturers; (2) a contribution of property, financial resources, effort, skill or knowledge on the part of each party; (3) a provision for the sharing of profits and losses; and (4) some degree of joint control and joint management by the parties over the enterprise." *Zeising v. Kelly*, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001).  "An indispensable essential of a contract of partnership or joint venture, both under common law and statutory law, is a mutual promise or undertaking of the parties to share in the profits of the business *and submit to the burden of making good the losses*."  *Matter of Steinbeck v. Gerosa*, 151 N.E.2d 170, 178 (N.Y. 1958).  "A joint venture does not arise simply because two parties have agreed together to act in concert to achieve some stated economic objective." *Rocchio v. Biondi*, 835 N.Y.S.2d 401, 403 (N.Y. App. Div. 2007).

Under New York law, a subsequent contract regarding the same subject matter supersedes a prior contract because "[p]rior agreements and negotiations are deemed to merge and be subsumed in a later written agreement." *Indep. Energy Corp. v. Trigen Energy Corp.*, 944 F. Supp. 1184, 1195 (S.D.N.Y. 1996) (granting defendant summary judgment on alleged breach of oral

agreement to pay development expenses unconditionally where superseding written contract predicated reimbursement on completion of the project).  "It is a well settled principle of contract law that a new agreement between the same parties on the same subject matter supersedes the old agreement."  *Ottawa Office Integration Inc. v. FTF Bus. Sys., Inc.*, 132 F.Supp.2d 215, 219 (S.D.N.Y. 2001).  "When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete integration of that contract, the parol evidence rule effectively bars any action to enforce a prior inconsistent oral agreement."  *Indep. Energy Corp.*, 944 F. Supp. at 1196.  "This is *a fortiori* true where the written agreement, as here, contain[s] . . . [an] integration clause."  *BLD Prods., LLC v. Viacom, Inc.*, No. 10-cv-2625 (PGG), 2011 WL 1327340, at *13 (S.D.N.Y. Mar. 31, 2011), *aff'd in part, vacated in part on other grounds, remanded sub nom. BLD Prods., LLC v. Remote Prods., Inc.*, 509 F. App'x 81 (2d Cir. 2013) (dismissing breach of oral contract claim where the parties entered into written contract on the same subject matter).  "[T]he parol evidence rule bars the consideration of extrinsic evidence of the meaning of a complete written agreement if the terms of the agreement, considered in isolation, are clear and unambiguous."  *Wayland Inv. Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 454 (S.D.N.Y. 2000) (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).  "It is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'"  *W.W .W. Assocs.*, 566 N.E.2d at 642 .  "Where the language of a contract is unambiguous, the question of interpretation is one of law, and summary judgment may be granted."  *Indep. Energy Corp.*, 944 F. Supp. at 1191.

Section 5.1(a) of the Operating Agreement unambiguously states, "the Manager [Forsythe] shall have full authority, power and discretion to make all decisions with respect to the Company's

business[.]"  DE 108-16, Ex. N.  Plaintiffs argue that "full authority" is not "exclusive authority."  DE 109 at 6.  However, the Operating Agreement goes on to say that "*[e]xcept as otherwise expressly provided* in this Agreement or the Act, the Members *shall have no right to control or manage*, nor shall they take any part in the control or management of, the property, business or affairs of the Company[.]"  Section 5.1(c) (emphasis added).  The Operating Agreement contains an integration clause, stating "[t]his Agreement, together with the Articles of Organization, embody the entire understanding and agreement between the Members concerning the subject matter hereof and supersede any and all prior negotiations, understandings or agreements with respect thereto."  Section 11.19.  Because the contract is fully integrated and the terms of the contract are unambiguous, the Operating Agreement grants Forsythe all control over Solar Club and the parol evidence rule bars the introduction of any prior representations the Roses may have made to the contrary in email correspondence or at the January 2012 meeting in New York.

In a last ditch effort, Mattes argues the "overarching" joint venture between the Roses and Mattes still stands because she is not a signatory to the Operating Agreement.  DE 109 at 6.  Again, this argument fails because the parol evidence rule bars the introduction of contrary evidence since the written contract is complete and unambiguous.  Regardless, Mattes' argument that the Operating Agreement is inapplicable to her is unpersuasive because she negotiated with Forsythe, DE 109-1, ¶ 26; DE 109-4, ¶ 8, and signed the Operating Agreement on behalf of MadMack.  DE 108-16, Ex. N at 34.  Thus, plaintiffs' claim for breach of the joint venture agreement fails because, even supposing such an agreement ever existed, it was superseded by the Operating Agreement and the parol evidence rule bars the introduction of any prior representations to the contrary.

Count Two for breach of fiduciary duty arising out of the joint venture/partnership also fails because, as explained *supra*, no actionable joint venture exists, and thus defendants do not

owe plaintiffs any duties as joint venturers/partners.

*Count Three – Breach of License and Assignment Agreements*

Count Three for breach of the License Agreement and Assignment Agreement asserts Forsythe violated the License Agreement by failing to use the Solar Active trademark in promoting the licensed products for 18 months and only recently used the trademark online as of January 2019.  DE 64, SAC ¶ 35.  Instead, defendants promoted its Ruby Wing and "Color Club" products to the exclusion of the Solar Active trademark.  *Id.*  In addition, advertising was not submitted to Licensor for prior approval.  *Id.*

The License Agreement requires the Licensee to "clearly identify" Licensor as the trademark owner whenever the Licensed Trademark is used in advertising or in any other manner.  DE 108-15, Section 5(b).  In addition, Licensee is required to obtain Licensor's approval of labels and other marketing materials.  Section 5(a).  Finally, Licensee was required to use "reasonable efforts" to promote the Licensed Trademark.  Section 5(b).  Notwithstanding these obligations, the Agreement contains a limitation of liability clause: "In no event will either party be liable to the other for any special, incidental, consequential, lost profits or indirect damages of any kind arising in any way out of this agreement, however caused and on any theory of liability, even ifthe [sic] other party has been advised of the possibility of such damages[.]"  Section 14(a).

"A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor."  *Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 643 N.E.2d 504, 507, 509 (N.Y. 1994) (limitation of liability clause applied where defendant's repudiation of the Agreement "was motivated exclusively by its own economic self-interest in divesting itself of a highly unprofitable business").  However, "an exculpatory clause is

unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.  This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith." *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416–17 (N.Y. 1983).  Nullifying a limitation of liability clause in a contract under New York law under public policy grounds requires "nothing short of in a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts."  *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 453–54 (S.D.N.Y. 2003) (discontinuance of service and subsequent decline in quality of service do not constitute the level of malice or intentional wrongdoing necessary to invalidate the limitation of liabilities provision); *compare United States v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 167 (2d Cir. 1996) (upholding invalidation of limitation of liability provision where the defendant broke repeated promises to provide employees, "grossly inflated backcharges" in order to "break" the plaintiff company, and stole $20,000 worth of plaintiff's material).

Plaintiffs fail to allege the malicious conduct or intentional wrongdoing that is necessary to invalidate the License Agreement's limitation of liability provision.  While defendants may have breached the License Agreement by failing to affix the Solar Active trademark on the nail polish product and failing to submit marketing materials to Mattes for pre-approval, mere nonperformance is woefully insufficient to invalidate a limitation of liability provision.  *See Metro. Life Ins. Co.*, N.E.2d at 507, 509.  The claims arising out of defendants' inadequate marketing efforts also fail because plaintiffs' own pleadings admit that defendants eventually used the Solar Active trademark online, DE 64, SAC ¶ 35, and it is undisputed that Ruby Wing was displayed at

at least one trade show.  DE 109-6, ¶ 11.  Because the limitations provision bars "any special, incidental, consequential, lost profits or indirect damages of any kind arising in any way out of this agreement, however caused and on any theory of," DE 108-15, Ex. M at 13, plaintiffs' claim for breach of the License and Assignment Agreements fails.

*Count Five – Breach of Services Agreement*

Count Five, brought derivatively by MadMack on behalf of Solar Club, alleges that Forsythe breached the Services Agreement by refusing to allow access to its financial records and refusing to recalculate the 30% administrative fee every six months.  DE 64, SAC ¶ 44.  Plaintiffs allege Forsythe collected fees above 30% for the majority of the life of the Services Agreement, reaching a high of 37%.  *Id.*

Per the Services Agreement, in exchange for serving as Solar Club's manager, Forsythe received 30% of the Solar Club's adjusted gross revenue, subject to revision at six-month intervals by Forsythe's accounting firm, Rosen & Federico.  DE 108-17, Section 6(a)(i).  If a member disagreed with the calculations, the objecting party may, at their expense, engage an independent accounting firm to recalculate the administrative fee.  Section 6(a)(ii).  For the purpose of making its review, the independent accounting firm may review Rosen & Federico's calculations.  *Id.*

It is undisputed that Forsythe's accountant, Mr. Rosen, calculated the Administrative and Operations Fee every six months, provided plaintiffs the combined revenue, expenses and the new fee, and that Solar Club paid Forsythe the Administrative Fee.  DE 109-1, ¶ 57.  Plaintiffs contest that Rosen never provided the "backup files and information" regarding Forsythe's revenues and overhead expenses.  *Id.*  However, nothing in the Services Agreement obligates Forsythe to provide such data to plaintiffs.  It is also undisputed that Mattes was not denied her right to an independent review of the Administrative and Operations Fee.  In March 2017, Mattes retained an accountant

to conduct a review and Forsythe offered him an opportunity to confer with Rosen, but Mattes' accountant passed away before he could review Rosen's calculations.  *Id.* ¶ 64.  Plaintiffs assert that the Administrative and Operations Fee often exceeded 30%.  However, the Services Agreement never states that the Administrative and Operations Fee is capped at 30%.  Instead, the contract states that the fee is to be recalculated every six months, and contemplates that the fee may increase or decrease.  *See* DE 108-17, Ex. O, Section 6(iv) ("Any amount payable as a result of a retroactive adjustment . . . shall be paid by (1) the Company to FCG if the Administrative and Operations Fee is adjusted *upward*, or (2) FCG to the Company if the Administrative and Operations Fee is adjusted *downward*[.]") (emphasis added).  Finally, plaintiffs' expert does not substantively contest the accuracy of the administrative fees charged, but merely states, "Without details of how they calculated the Admin Expenses . . . we have no way to verify the accuracy and propriety of Rosen's calculations."  DE 109-10, Decl. of Jay Abrams, ¶ 4.  Thus, even after drawing all reasonable inferences in plaintiffs' favor, plaintiffs fail to establish a breach of the Services Agreement.

*Count Four – Breach of Fiduciary Duty*

Count Four, brought derivatively by MadMack on behalf of Solar Club, asserts that Forsythe violated the fiduciary duties of loyalty and good faith that it owed as the sole manager of Solar Club by, *inter alia*, commingling funds, manipulating books and records of Solar Club for Forsythe's gain, charging administrative fees to Solar Club in excess of 30% of its adjusted gross income, refusing to allow audits of the calculations of the Administrative and Operations Fee, and carrying forward excessive loans to Solar Club and excessive fraudulent losses.  DE 64, SAC ¶ 38.

"Absent provisions in an LLC agreement 'explicitly' disclaiming the applicability of a

fiduciary duty, LLC members owe each other 'the traditional fiduciary duties that directors owe a corporation.'" *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438 (S.D.N.Y. 2010) (citation omitted).   As the managing member of Solar Club, an LLC, Forsythe owed a fiduciary duty towards the other non-managing members.  *See Pokoik v. Pokoik*, 982 N.Y.S.2d 67, 70 (N.Y. App. Div. 2014) ("As the managing member of the LLCs, [defendant] owed plaintiff— a nonmanaging member—a fiduciary duty").  However, "'[w]here a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract' and must be dismissed." *N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 105 (S.D.N.Y. 2013) (quoting *Alitalia Linee Aeree Italiane, S.p.A. v. Airline Tariff Publishing Co.*, 580 F. Supp. 2d 285, 294–95 (S.D.N.Y. 2008)).  "A breach of fiduciary duty claim is duplicative when it is based on allegations of fiduciary wrongdoing that are [ ] expressly raised in plaintiff's breach of contract claim." *N. Shipping Funds I, LLC*, 921 F. Supp. 2d at 105 (internal quotation marks and citation omitted).

Here, the Services Agreement governed plaintiffs' right to review Solar Club's books and records with respect to the Administrative Fee.  As explained *supra*, plaintiffs have not established a breach of the Services Agreement; moreover, plaintiffs have failed to present any evidence of manipulation of Solar Club's finances even after hiring an accountant expert witness.  Because Count Four is duplicative of the breach of Services Agreement claim asserted in Count Five and plaintiffs have failed to provide any evidence of wrongdoing, plaintiffs' fiduciary duty claim under Count Four fails as a matter of law.  *See N. Shipping Funds I, LLC*, 921 F. Supp. 2d at 105.  Finally, even if plaintiffs' unsubstantiated assertions raised a material factual dispute, it cannot overcome the Operating Agreement's exculpatory clause, which shields Forsythe from liability absent "fraud, gross negligence, willful misconduct, bad faith or a wrongful taking,"  DE 108-16, Ex. N,

20

Section 5.4, as there is no evidence that defendants intentionally manipulated Solar Club's finances for personal gain. *See* NY Limit Liab Co § 417(a); *John v. Varughese*, 149 N.Y.S.3d 126, 130 (N.Y. App. Div. 2021) (upholding exculpatory clause in LLC operating agreement).

*Count Six – Conversion*

Plaintiffs asserts defendants denied their right of possession of monetary profits, trade secrets, trademarks, and intellectual property.  In particular, plaintiffs assert Forsythe manipulated the calculation of royalty payments and fraudulently calculated administrative expenses to deprive Solar Club and MadMack of profits rightfully belonging to plaintiffs.  DE 64, SAC ¶ 47.

"To establish a cause of action for conversion under New York law, a plaintiff must show (1) 'legal ownership or an immediate superior right of possession to a specific identifiable thing' and (2) that the defendant 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'"  *Phansalkar v. Andersen Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001) (quoting *Independence Discount Corp. v. Bressner*, 365 N.Y.S.2d 44, 46 (N.Y. App. Div 1975)).  "A claim for conversion does not lie for the withholding of indefinite, intangible, and incorporeal species of property."  *Matzan v. Eastman Kodak Co.*, 521 N.Y.S.2d 917, 918 (N.Y. App. Div. 1987).  "[A]n action will lie under New York law for conversion of money where there is an obligation to return or otherwise treat in a particular manner the specific money in question . . . *and that money is specifically identifiable*."  *ADP Inv. Commc'n Servs., Inc. v. In House Att'y Servs., Inc.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005) (citation omitted).

Plaintiffs' conversion claims fail insofar as it rests on the misuse of trade secrets, trademarks and intellectual property because intangible property cannot be the subject of a conversion claim.  *See, e.g.*, *Spiegel v. Quality Bakers of Am. Co-op., Inc.*, No. 91-cv-5703 (KTD),

1992 WL 349799, at *7 (S.D.N.Y. Nov. 10, 1992) (rejecting conversion claim based on breach of a licensing agreement because "intangible property cannot be converted").  As to the conversion claim arising out of the royalty payments and administrative fee calculations, plaintiffs' claim fails because plaintiffs cite no evidence to back up their bald assertion that the financial records were manipulated, *see, e.g.*, DE 109-1, ¶¶ 52-53, 57, and, moreover, plaintiffs have failed to specify or even estimate the amount of money that was allegedly converted or where that money is located. *Compare ADP Inv. Commc'n Servs., Inc.*, 390 F. Supp. 2d at 224 (finding plausible conversion claim where plaintiff alleged the exact amount of a wire transfer of $277,699.89).

*Counts Seven and Fourteen – Fraudulent Inducement and Aiding and Abetting*

To make out a fraud in inducement claim under New York law, a plaintiff must establish the following five elements by clear and convincing evidence: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006).

In assessing the reasonableness of a plaintiff's reliance, New York courts follow a two-tier standard.  "When matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth." *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 80 (2d Cir. 1980), *abrogation on other grounds recognized by Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1090–91 (2d Cir. 1997).  However, "when misrepresentations have been held to concern matters that were not peculiarly within the defendant's knowledge, New York courts have often rejected plaintiff's claim of justifiable reliance because . . . (if plaintiff) has the means of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must

make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Id.* at 80–81 (citation omitted).

When assessing reasonableness, the court will "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, LLC*, 343 F.3d 189, 195 (2d Cir. 2003). As such, "courts are less forgiving where, *inter alia*, (1) the parties to a fraud were 'sophisticated businessmen,' (2) the parties were engaged in 'a major transaction,' (3) the plaintiff had access to 'critical information but fail[ed] to take advantage of that access,' or (4) the parties' agreement included 'a contractual provision expressly disclaiming reliance on any oral representations' in entering the contract." *Anhui Konka Green Lighting Co. v. Green Logic LED Elec. Supply, Inc.*, No. 18-cv-12255 (PAE), 2019 WL 6498094, at *9 (S.D.N.Y. Dec. 3, 2019) (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541–42 (2d Cir. 1997)).

With regard to the scienter requirement, "plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Fierro v. Gallucci*, No. 06-cv-5189 (JFB)(WDW), 2008 WL 2039545, at *11 (E.D.N.Y. May 12, 2008) (citing *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 663 (2d Cir. 1997)). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Fierro*, 2008 WL 2039545, at *11 (citing *Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Although parol evidence is not admissible to contradict the terms of the integrated contract, "the parol evidence rule has no application in a suit brought to rescind a contract on the ground of

fraud." *Sabo v. Delman*, 143 N.E.2d 906, 908 (N.Y. 1957); *see also Petrello v. White*, 412 F. Supp. 2d 215, 226 (E.D.N.Y. 2006), *aff'd*, 344 F. App'x 651 (2d Cir. 2009); ("[T]he introduction of extrinsic evidence with regard to a fraud in the inducement claim is a well-known exception to the parol evidence rule."). Nonetheless, "a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon . . . contrary oral representations." *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 599 (N.Y. 1959). "[I]n order to be considered sufficiently specific to bar a defense of fraudulent inducement under *Danann*, a guarantee must contain explicit disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *See Manufacturers Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 316 (2d Cir. 1993) (citing *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir. 1984)). "Thus, where specificity has been lacking, dismissal of the fraud claim has been ruled inappropriate." *Id.*

*Alleged Misrepresentations for Which Summary Judgment is Granted*

Count Seven alleges defendants made numerous material misrepresentations at the January 2012 meeting to fraudulently induce plaintiffs into entering the six June 2012 agreements. DE 64, SAC ¶ 51. The bulk of the alleged misrepresentations center around the degree of control Mattes would have under the new business arrangement: to wit, that Mattes would be working with defendants as a 50/50 partner, SAC ¶ 51(a), have primary responsibility for retail sales and all major marketing decisions would be made jointly, SAC ¶ 51(e), have access to business and financial records at any time as well as marketing data and be part of the decision-making process relating to all expenses and marketing, SAC ¶ 51(g), be able to continue promoting and selling the nail polish on her pre-existing website and through her pre-existing retail sale contacts, SAC ¶ 51(h), that defendants would sell the nail polish through plaintiffs' existing distributors and to

existing retail consumers, SAC ¶ 51(i)-(j), that defendants would continue to use the public relations company Mattes used, SAC ¶ 51(k), and that defendants were willing to combine the new color-changing nail polish in various packages with their existing product line, SAC ¶ 51(p).

Here, the *Danann* rule that a specific disclaimer destroys allegations of prior contrary oral representations applies because the License Agreement contains a specific disclaimer of the alleged misrepresentations which form the basis of plaintiffs' claim. Directly below the License Agreement's general integration clause, the contract states, "this Agreement is *not* to be construed as creating a partnership, joint venture, principal-agent or other relationship for any purpose whatsoever." DE 108-15, Ex. M,  Section 18(b) (emphasis added). Because plaintiffs' claims arise out of alleged misrepresentations regarding the degree of control Mattes would have over the new company and there is a clause specifically disclaiming any representations of a joint venture which would have created an equal partnership, plaintiffs' fraud claim is automatically barred by the parol evidence rule. *See Manufacturers Hanover Tr.*, 7 F.3d at 316.

Even supposing the disclaimer were not sufficiently specific, plaintiffs' fraud in the inducement claims regarding misrepresentations of the degree of control Mattes would have over the new business still fail because she cannot establish reasonable reliance.  Hardly an unsophisticated party or lacking bargaining power, Mattes was represented by counsel over the course of six months of negotiations and had potentially millions of orders for her product on the table.  Although defendants may have promised Mattes substantial control over the new company at their initial January 2012 meeting, in April 2012 the parties circulated a Term Sheet that omitted many of the representations previously made to Mattes, namely, that: she would have equal control over the new company; have the right to pre-approve all advertisements, marketing, and nail polish colors; have the right to directly audit the books and records of the new company with regards to

the 30% administrative fee; and be able to market the new nail polish on her website.  DE 109-1, ¶ 31.  Instead, the Term Sheet stated that Forsythe would be the managing member.  DE 108-12, Ex. J at 3.  Mattes read the Term Sheet and had an opportunity to consult with her lawyer but chose not to ask any questions because it was "pretty clear cut."  DE 108-6, Mattes Depo. at 157–58.  At this point, Mattes was put on notice that the terms of the new business arrangement may not conform to the "joint venture" she was promised earlier and should have made further inquiry.

Despite all this, in June 2012 Mattes signed an Operating Agreement which clearly stated that Forsythe has "full authority, power and discretion to make all decisions with respect to the Company's business" and MadMack "shall have no right to control or manage, nor shall they take part in the control or management of, the property, business or affairs of the Company."  DE 108-16, Ex. N, Section 5.1(a).  In addition, the License Agreement states, "this Agreement is *not* to be construed as creating a partnership, joint venture, principal-agent or other relationship for any purpose whatsoever."  DE 108-15, Ex. M,  Section 18(b) (emphasis added).  Under these circumstances, Mattes could not have reasonably relied on the Roses' promises six months earlier of a 50/50 partnership when the contract she signed unambiguously gave defendants complete control over the company.  *See Perrotti v Becker, Glynn, Melamed & Muffly LLP*, 918 N.Y.S.2d 423, 427 (N.Y. App. Div. 2011) ("a party claiming fraudulent inducement cannot be said to have justifiably relied on a representation when that very representation is negated by the terms of a contract").  Thus, plaintiffs' fraudulent inducement claims under Count Seven and aiding and abetting fraud claims under Count Fourteen fail as a matter of law as to the alleged misrepresentations regarding the degree of control plaintiffs would have over the new company.

Similarly, plaintiffs fail to establish reasonable reliance as to the allegations of fraud arising out of their access to the company's business records.  The April 2012 Term Sheet stated an

independent accounting firm may examine the calculation of the administrative fee by defendants' accountant, DE 108-12, Ex. J at 4, a provision which also appeared in the final version of the Services Agreement. *See* DE 108-17, Section 6(a)(ii). The Operating Agreement states only that the Members will have the right to inspect and copy certain records upon reasonable advance notice such as tax returns, Articles of Organization, and financial statements – not "back up" documentation of how the administrative fee was calculated. *See* DE 108-16, Ex. N, Section 11.2. Thus, plaintiffs' fraudulent inducement claims fail as to the alleged misrepresentations regarding plaintiffs' access to business and financial records.

Plaintiffs also allege that defendants fraudulently misrepresented that all press and publicity materials would include the Solar Active trade name. SAC ¶ 51(n). However, a cause of action for fraud cannot lie "based solely upon failure to perform contractual promises of future acts." *Deligiannis v. PepsiCo, Inc.*, 757 F. Supp. 241, 253 (S.D.N.Y. 1991). "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 20 (2d Cir. 1996) (citations omitted). None of the above aforementioned exceptions are alleged or argued by plaintiffs. Thus, plaintiffs' fraudulent inducement claims fail as to the alleged misrepresentations regarding the failure to include the Solar Active trade name.

The alleged misrepresentation regarding defendants' ability to fulfill the two-million bottle order for Avon, SAC ¶ 51(d), fails as well. Fulfillment of the order depended on the cost of manufacturing, and after Michael Rose gave Mattes their pricing, Mattes testified the pricing was "way too high" for what Avon wanted. DE 109-1, ¶ 22. As such, Mattes has effectively admitted

that defendant's statement was not a misrepresentation of its ability to fulfill the two-million bottle order. Moreover, a cause of action for fraud cannot lie "based solely upon failure to perform contractual promises of future acts." *Deligiannis*, 757 F. Supp. at 253.

The alleged misrepresentations concerning the use of Taylor Swift and Lady Gaga as spokespersons or promoters of the nail polish product, SAC ¶ 51(l)-(m), fail because plaintiffs cannot establish reasonable reliance. Mattes never saw any marketing materials with Taylor Swift and did nothing to confirm whether Swift was in fact the spokesperson. DE 109-1, ¶ 43. To the contrary, Mattes testified that she was not suspicious that the deal with Taylor Swift was not materializing, which suggests that it was not material. DE 109-1, ¶ 44. Michael Rose forwarded Mattes an email from a Swift representative who said they were "waiting to hear from the lawyer to finalize all of the trademarking," DE 109-6 at 34-35, Ex. 10, which shows that Mattes knew or should have known the deal with Swift was not yet finalized. Under these circumstances, Mattes could not have reasonably relied solely upon defendants' oral representations that defendants had hired not one but two major celebrities to promote her color-changing nail polish without taking any efforts to verify that information.

The alleged misrepresentation that the new nail polish would be of "equal or better color-changing quality" than the nail polish manufactured by plaintiffs, SAC ¶ 51(c), is not actionable because it is a vague and indefinite statement of opinion. *See Fierro v. Gallucci*, No. 06-cv-5189 (JFB)(WDW), 2010 WL 1223122, at *12–13 (E.D.N.Y. Mar. 24, 2010) (citing *Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir. 1976)). Similarly, the alleged misrepresentation that defendant would "be profitable from day one" and reach gross profits of $10 million in the first year, SAC ¶¶ 51 (f), (q), is a non-actionable estimate of something which is "hoped or expected to occur in the future." *Zanani v. Savad*, 630 N.Y.S.2d 89, 90 (N.Y. App. Div. 1995) (projection of

a plaintiff's future real estate tax liability not actionable).

*Alleged Misrepresentations for Which Summary Judgment is Denied*

Plaintiffs allege that the Roses misrepresented Forsythe's size, namely, that it was a $34 million company and the second largest nail polish company in the US.  SAC ¶ 51(b).  Plaintiffs' expert witness found that Forsythe was "not close to being a $34 million dollar company" and sales for fiscal year 2013 were merely $11.7 million.  DE 109-9, ¶ 9(a).  Defendants have not controverted the truth of these sales figures, or the materiality of the alleged misrepresentations.  Because the sales of defendants' business, a non-public company, is peculiarly within defendants' knowledge, plaintiffs were entitled to rely on their representations.  *Mallis*, 615 F.2d at 80–81; *see also Hobart v. Schuler*, 434 N.E.2d 715, 716 (N.Y. 1982) (affirming denial of summary judgment where claimant alleged he was induced to purchase a business in reliance on a fraudulent statement of the business's income).   Defendants cite *Stuart Lipsky, P.C. v. Price*, but that case is distinguishable because there plaintiffs had "the means available to ascertain the truth" regarding the size of the company but chose to rely on defendants' oral representations.  625 N.Y.S.2d 563, 564 (N.Y. App. Div. 1995).  Defendants have not alleged that Forsythe's financial data was offered or made available to Mattes before she entered into the June 2012 agreements.  Defendants baldly assert that plaintiffs fail to offer evidence of intent to defraud, but given the potential for major profits, there is a genuine dispute of material fact as to defendants' intent because they had both motive and opportunity to commit fraud.  *See Fierro*, 2008 WL 2039545, at *11.  Finally, plaintiffs' detailed expert report of varying damages valuations is sufficient to establish a genuine dispute as to damages.  *See* DE 109-9 at 16.

Plaintiffs also allege defendants misrepresented that they had a large deal in place with Amway.  SAC ¶ 51(o).  Indeed, Michael Rose stated in his deposition that Forsythe may have lost

its account with Amway "sometime prior to 2012," DE 108-9, Michael Rose Depo. at 48:16-25, which, if true, would cast serious doubt on the veracity of the supposed deal with Amway when he met with Mattes in January 2012.  Defendants merely argue that plaintiffs cannot establish reasonable reliance because Mattes did not take any efforts to verify this information.  Since this information was peculiarly within defendants' knowledge, plaintiffs were entitled to rely on their representations.  *Mallis*, 615 F.2d at 80–81.  As explained earlier, plaintiffs have put forth sufficient evidence to create a genuine dispute of material fact as to the elements of intent and damages.

For these reasons, defendants' motion for summary judgment on the fraud and aiding and abetting fraud claims is denied as to the alleged misrepresentations that (i) Forsythe was a $34 million company and the second largest nail polish company in the US and (ii) defendants had a large deal in place with Amway.  Otherwise, defendants' motion for summary judgment on the fraud and aiding and abetting fraud claims is granted.

*Count Eight – Securities Fraud in Violation of California Corporations Code § 25401*

As this Court has previously ruled, California's blue sky laws apply since "there is no conflict between California and New York's blue sky laws because 'New York has no interest in precluding claims like those brought by the plaintiff[.]'"  *Hatteras Enterprises Inc.*, 2018 WL 1935984, at *9 (citing *Fed. Hous. Fin. Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 291 (S.D.N.Y. 2012)).  "Section 25401 of the California Corporations Code makes it unlawful for 'any person to offer or sell a security . . . by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.'"  *Hatteras Enterprises, Inc.*, 2019 WL 9443845, at *4.

Under Cal. Corp. Code § 25019, "'Security' means any . . . interest in a limited liability

30

company and any class or series of those interests (including any fractional or other interest in that interest), except a membership interest in a limited liability company in which the person claiming this exception can prove that all of the members are actively engaged in the management of the limited liability company[.]"  A "'fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision.'" *Charney v. Standard Gen., L.P.*, 2021 WL 164361, at *7 (Cal. Ct. App. Jan. 19, 2021) (unpublished)[5] (citing *Insurance Underwriters Clearing House, Inc. v. Natomas Co.*, 228 Cal. Rptr. 449, 453 (Cal. Ct. App. 1986)).  "Sections 25401 and 25501 differ from common law negligent misrepresentation in that: (1) proof of reliance is not required, (2) although the fact misrepresented or omitted must be 'material,' no proof of causation is required, and (3) plaintiff need not plead defendant's negligence." *Bowden v. Robinson*, 136 Cal. Rptr. 871, 878 (Cal. Ct. App. 1977).  As such, "scienter is not an element of sections 25401 and 25501." *Brooks v. Tarsadia Hotels*, No. 3:18-cv-2290 (GPC)(KSC), 2019 WL 2436395, at *15 (S.D. Cal. June 11, 2019).  However, "[t]o avoid any implication that strict liability is involved, the Legislature provided that as a defense the defendant may: (1) prove that he exercised reasonable care and did not know of the untruth or omission, (2) show that even if he had exercised reasonable care, he would not have known of the untruth or omission, and (3) show that the plaintiff knew the facts concerning the untruth or omission." *Bowden*, 136 Cal. Rptr. at 878.  The statute does not cover cases of "simple nondisclosure," *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 225 (3d Cir. 2002) (citing *Lynch v. Cook*, 196 Cal. Rptr. 544, 554 (Cal. Ct. App. 1983)), and "vague extra-contractual promises [do not] constitute a misrepresentation or omission of material facts." *Charney*, 2021 WL 164361, at *7.

---

[5] Unpublished California state court opinions may be considered as persuasive authority in federal courts.  *See Lefkowitz v. Westreich*, No. 16-CV-6845 (JGK), 2017 WL 3491968, at *5, n.5 (S.D.N.Y. Aug. 14, 2017).

Defendants do not dispute that MadMack's non-managing interest in Solar Club is a security covered under Cal. Corp. Code § 25401. *See Rosen v. Urb. Commons, LLC*, No. 20-cv-01973(JLS)(DFM), 2021 WL 3264147, at *2 (C.D. Cal. July 23, 2021) ("Defendants do not dispute[] that the offering and selling of membership interests in [limited liability companies] constitutes a security for purposes of California securities law."). Since reliance, causation, and scienter are not elements of a § 25401 claim and the falsity of most of the representations is not in dispute, the principal issue is whether the alleged misrepresentations were material.

California courts have imposed a reasonableness requirement on the materiality element of a § 25401 claim. In *Charney v. Standard Gen., L.P.*, a former CEO alleged that a hedge fund fraudulently promised they would help him regain control of his company even though said promise was not contained in the agreement pursuant to which the CEO resigned. 2021 WL 164361 at *2. A California court found the alleged misrepresentation was not material because "[g]iven the contradictory chasm between the express terms of the agreements and the promises Charney claims Standard General made, it is not reasonable to conclude Charney considered those promises material and 'important in reaching [his] investment decision.'" *Id.* at *7; *see also Ins. Underwriters Clearing House, Inc.*, 228 Cal. Rptr. at 454 (Cal. Ct. App. 1986) (finding no material omission supporting § 25401 claim because no reasonable investor could have been misled as to the preferred shareholders' voting rights where the prospectus disclosed that preferred shareholders were entitled to vote on some, but not all mergers). Whereas the Court has already found reasonable reliance as to the alleged misrepresentations regarding the size of defendants' company, ¶ 51(b), and the large deal in place with Amway, SAC ¶ 51(o), and defendants have not disputed the materiality of said misrepresentations, summary judgment is denied as to the claims of securities fraud arising out of said misrepresentations under Cal. Corp. Code § 25401 because

there is a genuine dispute of material fact as to whether a "reasonable investor would consider [those representations] important in reaching an investment decision."  *Charney*, 2021 WL 164361, at *7.

Summary judgment is granted as to the remaining claims for securities fraud under Cal. Corp. Code § 25401 either because the Court has already found no reasonable reliance as to the remaining alleged misrepresentations, and therefore no "reasonable investor would consider [those representations] important in reaching an investment decision," *Charney*, 2021 WL 164361, at *7, or for the reasons stated previously under Count Seven.

*Count Twelve – Accounting*

Count Twelve demands a detailed accounting and itemization of expenditures and funds received by defendants in connection with Mattes' color-changing nail polish.  DE 64, SAC ¶ 71.

"To state a claim for an accounting under New York law, a plaintiff must establish: (1) relations of a mutual and confidential nature; (2) money or property entrusted to the defendant imposing upon him a burden of accounting; (3) that there is no adequate legal remedy; and (4) in some cases, a demand for an accounting and a refusal." *Associated Mortg. Bankers, Inc. v. Calcon Mut. Mortg. LLC*, 159 F. Supp. 3d 324, 338 (E.D.N.Y. 2016) (citation omitted).  "With respect to the third element of an accounting claim—namely, whether there is no adequate remedy at law— [] New York courts have held that 'an equitable accounting claim cannot coexist with a breach of contract claim covering the same subject matter[]' . . . because a plaintiff would be able to obtain the information and damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law." *Id.* at 340 (dismissing accounting claim as duplicative of breach of contract claim and because plaintiff has a sufficient legal remedy to obtain defendant's financial records through discovery in the context of its breach of contract claim) (citation

omitted).  "The fact that [plaintiff] has not been satisfied with [defendants'] responses to its discovery requests does not give [plaintiff] the right to an equitable remedy of accounting" because they may file "a motion to compel . . . pursuant to Fed. R. Civ. P. 37."  *Id.* at 341; *see also Soley v. Wasserman*, 639 F. App'x 670, 675 (2d Cir. 2016) (argument that plaintiff did not receive adequate discovery to constitute an adequate remedy at law is without merit because the "district court is afforded wide discretion in evaluating the sufficiency of discovery.").

Here, plaintiffs have done just that.  After plaintiffs filed a Rule 37 letter motion to compel the production of certain financial records, Magistrate Judge Wicks ordered defendants to produce backup expense files from 2012 to 2014 supporting the expenses on the general ledgers for: (1) operating expenses, (2) marketing expenses, (3) show expenses, (4) manufacturing of product expenses, (5) rent of facilities expenses, and (6) raw materials/cost of goods sold expenses.  DE 101 at 2.  The parties resolved their discovery disputes regarding Forsythe's 2012 income statements, general ledger, and tax return.  *Id.*  Plaintiffs' counsel submitted an affidavit averring that defendants produced a "data dump" of invoices in response to Judge Wicks' discovery order, effectively admitting that the documents were produced.  DE 109-5, Decl. of Robert Silverman, ¶ 4.  Because plaintiffs have been offered an adequate remedy at law through discovery, plaintiffs' accounting claim fails as a matter of law.

### Count Thirteen - Constructive Trust

"Generally, New York law requires that a person establish four elements before a court will impose a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject *res* made in reliance on that promise; and (4) unjust enrichment."  *United States v. Coluccio*, 51 F.3d 337, 340 (2d Cir. 1995).  "New York courts have clarified that '[a]s an equitable remedy, a constructive trust should not be imposed unless it is

34

demonstrated that a legal remedy is inadequate.'" *In re First Cent. Fin. Corp.*, 377 F.3d 209, 215 (2d Cir. 2004) (citation omitted).  "It is well established that the existence of a contract precludes a claim for a constructive trust." *Abraham v. Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) (citing *In re First Cent. Fin. Corp.*, 377 F.3d at 213).  Because the six June 2012 contracts govern the relationship between the parties here, the constructive trust claim is duplicative of the breach of contract claim and thus fails as a matter of law.

*Conclusion*

For the reasons set forth, defendants' motion for summary judgment is DENIED for Counts Seven (Fraudulent Inducement), Eight (Securities Fraud under Cal. Corp. Code § 25401), and Fourteen (Aiding and Abetting Fraud) as to the alleged misrepresentations regarding the size of defendants' company and the large deal in place with Amway, but is otherwise GRANTED in its entirety.  Plaintiffs are directed to file a revised expert damages report reflecting the remaining claims within thirty days and advise the Court if they still intend to move forward.  Defendants are to advise the Court ten days thereafter if they wish to pursue the counterclaims.

**SO ORDERED.**

Dated: Central Islip, New York
        August 25, 2022

                                        /s/ Gary R. Brown
                                        GARY R. BROWN
                                        United States District Judge