**FILED**
**CLERK**

**10/28/2025**

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X
HATTERAS ENTERPRISES, INC., a
California Corporation; MADMACK LLC, a
California Limited Liability Company; and
DEBRA MATTES, an individual,

 *Plaintiffs*,

 -against-

FORSYTHE COSMETIC GROUP, LTD;
COLOR CLUB, LLC, a New York Limited
Liability Company; HARRIET ROSE 2009
IRREVOCABLE TRUST; HARRIET ROSE,
an individual; and MICHAEL ROSE, an
individual,
 *Defendants*.

----------------------------------------------------------------X

**OPINION**

15-CV-05887 (JMW)

**A P P E A R A N C E S:**

Robert M. Silverman
**Robert M. Silverman**
269 South Beverly Drive, Suite 1358
Beverly Hills, CA 90212
*Attorneys for Plaintiffs*

Daniel A. Osborn
Lindsay Trust
**Osborn Law P.C.**
43 West 43rd Street, Ste 131
New York, NY 10036
*Attorneys for Defendants*

**WICKS**, Magistrate Judge:

In 2008, Plaintiff Debra Mattes ("Mattes") developed a nail polish that changed color in

"sunlight due to a chemical reaction to ultra-violet rays." (ECF No. 64 at 5-8; Tr. 24:1-7.)  She

1

eventually entered into an agreement with Defendants[1] to complete large-scale orders to third parties for the sale of her nail polish. (*Id.*) The parties entered into a joint venture known as Solar Club, LLC ("Solar Club"). (ECF No. 64 at 7.) In June of 2012, the parties executed the following six contracts: (i) License Agreement, (ii) Operating Agreement, (iii) Assignment and Assumption Agreement, (iv) Loan Agreement, (v) Security Agreement, and (vi) Services Agreement.[2] (*Id.* at 6-8.)

One year into the joint venture, Mattes received Solar Club's tax returns and only then realized that Defendant Forsythe Cosmetic Group, LTD ("Forsythe") was not the $34 million company it had represented itself to be. Plaintiffs filed this action alleging, *inter alia*, fraudulent inducement and breach of contract arising out of the 2012 agreements for the rights to Plaintiffs' color-changing nail polish. (ECF No. 1.)

Following the Hon. Gary R. Brown's grant *in part* and denial *in part* of Defendants' Motion for Summary Judgment (ECF No. 111), three claims remained for trial.[3] (ECF No. 111.) Specifically, Count Seven for Fraudulent Inducement under New York law, Count Eight for Securities Fraud under Cal. Corp. Code § 25401, and Count Fourteen for Aiding and Abetting

---

[1] Defendants are Forsythe Cosmetic Group, Ltd (currently subject to an automatic bankruptcy stay), Harriet Rose, Michael Rose, and Harriet Rose 2009 Irrevocable Trust.

[2] Notably, Plaintiffs did not seek to admit into evidence five of the six agreements. Rather, three months after the conclusion of trial, Plaintiffs filed a motion to introduce evidence post-trial, styled as a "request for judicial notice" asking the Court to nunc pro tunc admit all the agreements, which Defendants opposed, and the Court ultimately denied. (*See* ECF Nos. 168, 171-72.) In any event, the Operating Agreement was entered into evidence (*see* ECF No. 165 at 2), and there is no dispute that the parties entered into these six agreements (*see* ECF Nos. 169-70), which form the basis of the remaining claims tried.

[3] Defendants also asserted three counterclaims in their Amended Answer—one claim for breach of contract and two claims for unjust enrichment. (*See* ECF No. 68 at 12-14.) However, Judge Brown did not address Defendants' counterclaims because no request was made for judgment on the counterclaims. (*Id.* at 12 n.4.) As set forth below, no proof or evidence was adduced to support the counterclaims.

Fraud under New York law. (*Id.*) As for the fraud claims, Judge Brown stated "[f]or these reasons, defendants' motion for summary judgment on the fraud and aiding and abetting fraud claims is denied as to the alleged misrepresentations that (i) Forsythe was a $34 million company and the second largest nail polish company in the US and (ii) defendants had a large deal in place with Amway. Otherwise, defendants' motion for summary judgment on the fraud and aiding and abetting fraud claims is granted." (*Id.* at 30.) On October 2, 2023, the parties consented to the undersigned for all purposes. (ECF No. 122.) Following a six-month stay pending the outcome of a bankruptcy proceeding,[4] trial was scheduled and a bench trial[5] began on May 12, 2025 and concluded on May 14, 2025. (ECF Nos. 162-64.)

Upon careful review of the trial transcript, the evidence admitted at trial, the parties' proposed findings of fact and conclusions of law (ECF Nos. 169-70), and the controlling law on the issues presented, the Court finds in favor of Defendants on the three claims. This Opinion constitutes the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a).

## *THE TRIAL*

### I.   **THE BURDEN OF PROOF**

Fraud claims require parties to prove each element by a clear and convincing evidence. *Learning Experience Sys., LLC v. Collins*, No. 20-CV-2504 (MKB), 2023 WL 5835034, at *15

---

[4] On November 6, 2024, the Court granted Plaintiffs' Motion to Vacate the Stay and wrote "the [B]ankruptcy [C]ourt vacated the automatic stay as to the Non-Debtor Defendants pursuant to Section 362(d), explicitly permitting Plaintiffs to "take all actions necessary to continue and complete" the instant case. (*See In re Forsythe Cosmetic Group, Ltd.*, Debtor, Case No. 24-70997, ECF No. 47.) The undersigned adheres to the bankruptcy court's judgment." (ECF No. 140 at 6.) Therefore, the trial proceeded against the non-debtor Defendants. (*Id.* at 7.)

[5] The parties agreed to a bench trial on the issues, waiving the right, if any, to a jury trial. (ECF No. 129; Electronic Order dated March 4, 2024.)

(E.D.N.Y. Sept. 8, 2023). In other words, "[i]n proving the elements of fraud, the proponent of the claim must put forth clear and convincing evidence, ... a standard which applies at the summary judgment stage as well as at trial." *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 558 (S.D.N.Y. 2009) (citing *Mix v. Neff,* 99 A.D.2d 180, 183, 473 N.Y.S.2d 31 (N.Y. App. Div. 3d Dep't 1984); *Century Pac., Inc. v. Hilton Hotels Corp.,* 528 F.Supp.2d 206, 219 (S.D.N.Y.2007)) (internal citations omitted). That is because "[c]lear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 226 (E.D.N.Y. 2024) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 260 (2d Cir. 2021)).

Specific here, New York law requires that "'[e]ach element of the fraud claim must be shown by clear and convincing evidence,' and 'the evidence presented … must be enough to make any inference of fraud ... unequivocal.'" *Koral v. Saunders*, No. CV 17-7011 (JS)(AYS), 2023 WL 6390471, at *6 (E.D.N.Y. Aug. 22, 2023) (discussing standard for summary judgment) (quoting *Century Pac., Inc.*, 528 F. Supp. 2d at 219 (citing *Abrahami v. UPC Const. Co. Inc.*, 638 N.Y.S.2d 11, 13 (N.Y. App. Div. 1st Dep't 1996)).

The same applies to a claim for aiding and abetting fraud. *See Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 482 (S.D.N.Y. 2018) (citing *de Abreu v. Bank of Am. Corp.*, 812 F.Supp.2d 316, 322 (S.D.N.Y. 2011) ("Because at trial '[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence[,] ... to survive summary judgment, Plaintiffs must have adduced sufficient evidence to meet this standard at trial.'")); *EIG Energy*

*Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, 724 F. Supp. 3d 340, 357 (S.D.N.Y. 2024) (citing *de Abreu*, 812 F.Supp.2d at 322) (same).

Unlike the New York fraud claims, however, a lesser standard of proof applies to the fraud claim brought under California law.[6] That is, in order to prove a claim of fraud under California law, the burden of proof is by a mere preponderance of the evidence. *See Liodas v. Sahadi*, 562 P.2d 316, 324 (Cal. 1977) ("the plaintiff has failed to carry his burden of proving the fact of fraud by a Preponderance of the evidence"); *Sierra Nat. Bank v. Brown*, 95 Cal. Rptr. 742, 746 (Cal. Ct. App. 1971) ("The burden of proof, however, required in a fraud case is no more than a preponderance of the evidence.")

Therefore, the claim for securities fraud in violation of California Corporations Code § 25401 (Count Eight), as alleged here, is to be proven by a preponderance of the evidence. On the other hand, both the fraudulent inducement (Count Seven) and aiding and abetting fraud (Count Fourteen) claims are to be considered under the "clear and convincing standard" under New York law.

It is against this backdrop that the Court analyzes the three remaining claims.

## II.   <u>FINDINGS OF FACT</u>

The following witnesses testified at trial: (i) Plaintiff Mattes, Chief Executive Officer of Hatteras, and Manager of MadMack LLC,  (ii) Defendant Harriet Rose ("H. Rose"), President of Color Club and Owner of Forsythe, (iii) Defendant Michael Rose ("M. Rose"), Vice President of Forsythe, and (iv) witnesses Vincenzo DeBernardo ("DeBernardo"), Corey Alan Ingber

---

[6] There is no dispute among the parties that the appropriate burden of proof for the California claim is that of a preponderance of the evidence. (*See* ECF Nos. 169 at 23; 170 at 14 n.6.)

("Ingber"), Whitney Matza ("Matza"), Jeff Pink ("Pink"), and Jay B. Abrams ("Abrams").[7] (*See* ECF Nos. 165; 169-70.)

When the court is presented with countervailing testimony, the Court's determination as to which to credit "cannot be clearly erroneous." *Hart v. Suffolk Cnty.*, No. 23-7269, 2025 WL 1374984, at *1 (2d Cir. May 13, 2025). "Where, however, two witnesses have each told a 'coherent and facially plausible story that is not contradicted by extrinsic evidence,' the trial court's decision to credit one witness over the other, 'if not internally inconsistent, can virtually never be clear error.'" *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) (citing *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575-76 (1985)).

### *Plaintiff Debra Mattes*

In 1992, Mattes formed a company called Solar Active, a corporation in which she is the sole shareholder. (Tr. 15:2-16.) At that time, Solar Active was a t-shirt company, and Mattes learned about photochromic technology that would allow the t-shirt to change colors. (Tr. 15-17.) After Mattes met with an Ohio lab, Second Story Concepts, she became the sole distributor of this technology. (Tr. 19-20.) Mattes developed other products as well such as beads, buttons, inks, shoelaces, and threads. (Tr. 22:9-19.) It was not until 2008 when Mattes started making nail polish. (Tr. 24:3.) She developed over 40 nail polish colors from 2009 to 2011. (Tr. 24:4-12.) In 2012, the nail polish market was projected to reach 7.3 billion dollars according to a publication at the time. (Tr. 26:10-11; Plaintiffs' Ex. 39.) However, Mattes noticed a rise in demand for nail polish in 2010. (Tr. 27:9-12.) Mattes was initially making nail polish in her kitchen, however that became impracticable when the Avon contacted her to do a large order of over two-million

---

[7] Defendant Forsythe was not present at the trial as the case is stayed as to Forsythe, due to bankruptcy filing. (*See* ECF Nos. 130, 133, 140.)

bottles. (Tr. 28:14-17.) Twin Colors was a European brand that became Mattes' distributor in late-2010. (Tr. 28:10-25.)

Mattes also contacted Orly International ("Orly") and once they met, Orly offered to manufacture and carry an exclusive line under their private label. (Tr. 29:14-23.) Orly also offered a one-year contract to pay Mattes 20% royalties for their exclusive line and Mattes would still be able to sell her own products. (Tr. 30:7-20.) Plaintiffs' Exhibit 54 was admitted into evidence that was an email chain between Solar Active and Pink from Orly. (Tr. 31:18.) The email discussed pricing. (Tr. 32-33.) As demonstrated by Plaintiffs' Exhibit 56, an email dated February 2, 2012, between Solar Active and an employee of Orly, after months of testing, the green light was given to proceed with the project. (Tr. 35:10-25.) In addition, Plaintiffs' Exhibit 56A, an email between Solar Active and the Vice President of Operations of Orly, demonstrates that Orly and Mattes had a "partnership". (Tr. 36:8.) However, Mattes decided not to go through with the Orly deal because M. Rose contacted her representing that his company was interested in bringing her nail polish under their private label. (Tr. 37:24-25; 38:1-22.)

Plaintiffs' Exhibit 18 is a handwritten sheet prepared by Mattes contemporaneously while on the November 2011 call with M. Rose. (Tr. 39-40.) During their conversation, M. Rose informed Mattes that his company could manufacture a large order of her product since they just concluded a million to a half bottle order for Urban Outfitters. (Tr. 40:13-23.) M. Rose also stated that Forsythe sold eighty-five (85) million bottles per year, were bigger than Orly and only second to OPI, who produced two hundred (200) million bottles a year. (Tr. 41:1-8.) Mattes did inform M. Rose that she was going to sign a deal with a company to manufacture a two million bottle order for her. (Tr. 41:15-21.) According to Mattes, M. Rose called her constantly. (Tr. 41:24-25.) Mattes and her then boyfriend, Ingber, met with M. Rose, H. Rose, and Matza in New

York on January 12, 2012. (Tr. 42.) At this meeting, M. Rose told Mattes that Forsythe was a 34-million-company and could manufacture all of Mattes' needs including the Avon order. (Tr. 43.) M. Rose stated that his company could manufacture the Avon order much faster than Orly could. (Tr. 43:15-22.) In addition, M. Rose told Mattes that she could have 50% ownership of her own company rather than just the 20 percent royalty business arrangement. (Tr. 43:4-8.) H. Rose confirmed all these representations at the meeting. (Tr. 44:7-15.)

The next morning, Mattes and Ingber had a visit to Avon to discuss pricing. (Tr. 45:12-25.) Avon was ready to proceed. (Tr. 46:2.) Plaintiffs' Exhibit 49 was admitted into evidence, which was an email between Solar Active and M. Rose, where M. Rose stated "I would not talk about Avon and the 2 million pieces. I would just listen" in connection with Orly. (Tr. 47:5-6.) Mattes upon returning to California attempted to verify and do research on Defendants via the internet. (Tr. 49:1-4.)

Mattes had an attorney, Lester Boxer, who was assisting her with the contracts. (Tr. 54:1-5.) However, Forsythe would not give Mattes any financial information, only projections. (Tr. 55:6-23.) Plaintiffs' Exhibit 28 is an email between Mr. Boxer and Forsythe's attorney, Neil Kaufman, where Mr. Kaufman expressly states he was "instructed by [Forsythe] that the joint venture relationship should not provide Mattes access to [Forsythe's] confidential financial information." Likewise, Plaintiffs' Exhibit 30 shows H. Rose informing Mattes not to contact their accountant. (Tr. 66:5-13.) Mattes received revised projections via email from the accountant in March of 2012 (*see* Plaintiffs' Exhibit 29), which she relied upon. (Tr. 64; 65:1-13.) Mattes was confused after seeing some numbers on a K-1 report. (Tr. 68:6-25; 67.)

Mattes testified that the Avon deal was stalled because of M. Rose and eventually went away. (Tr. 87.) Mattes ultimately entered into six contracts with Defendants in June of 2012. (Tr.

88.) Mattes then testified that during the meeting in January, she was told that there was a large Amway deal. (Tr. 91:24-25.) However, Mattes was informed of this prior to that meeting, somewhere between November of 2011 and January of 2012, because she had to sign a confidentiality document just for Amway. (Tr. 92.) M. Rose informed Mattes that there was a large deal with Amway for beads and other color changing products. (Tr. 92:15-24.) However, Mattes was told that she could not speak with Amway and had to go through Defendants. (Tr. 97:10-13.) Amway was not an existing customer according to Mattes. (Tr. 97:17-19.) On February 3, 2012, Mattes emailed Pink from Orly as dictated by M. Rose, informing Pink that she could not go forward with proposed deal because of FDA concerns. (Tr. 108-09.) However, the real reason was because she was going to be exclusive with Forsythe. (Tr. 109: 23-24.) If Mattes had never met M. Rose or with the other Defendants, she would have accepted the Orly deal. (Tr. 110.)

### *Vincenzo DeBernardo*

DeBernardo, a prior business partner of Mattes', testified. DeBernardo contacted Mattes after his friend learned about the color changing t-shirts. (Tr. 117:19-20.) The two met in California in 2010. (Tr. 117:22-24; 118:23-24.) DeBernardo was there for t-shirts but became intrigued in Mattes' nail polish. (Tr. 118:10-15.) After doing marketing research in Europe, the two created the brand, Twin Color, LLC, which was a California company with DeBernardo as the sole member. (Tr. 119-20.) DeBernardo and his two friends invested $480,000 in the new company. (Tr. 120:22-25.) DeBernardo believed that in 2011, Twin Color, LLC sold about 25,000 nail polish bottles. (Tr. 128:7-10.) In 2012, Mattes terminated the distribution agreement with DeBernardo and that was the end of their financial relationship. (Tr. 128:20-25; Tr. 129:1-2.)

## *Defendant Michael Rose*

Next was M. Rose's testimony, who held a position as Vice President of Sales for Forsythe. (Tr. 132; *see* Plaintiffs' Exhibit 35 at 2.) M. Rose first became aware of the color changing nail polish through his distributor in Portugal. (Tr. 132:22-25; 133:1-3.) M. Rose denied informing Mattes of a contract he had with Urban Outfitters, that Forsythe manufactured 85 million bottles per year, or that Forsythe was a larger company than Orly during their initial call. (Tr. 135.) M. Rose also denied calling Mattes every day. (Tr. 139.) During the meeting that was held in January, the parties discussed doing business together and that Forsythe was a fully integrated manufacture who dealt with major brands so they would have the capability to produce the nail polish. (Tr. 141:9-17.) M. Rose was adamant that he never made a statement that Forsythe was a $34 million company. (Tr. 142:1-8; 198:4-6.) M. Rose also denied that H. Rose discussed the size of Forsythe or the Amway deal. (Tr. 145:11-18.) However, M. Rose did freely admit that he discussed Urban Outfitters and Amway with Mattes at the January meeting. (Tr. 146:4-18.) M. Rose said he never knew that Mattes had a potential royalty deal with Orly and never gave advice to Mattes on how to deal with Orly. (147:20-25; 148:1-11.) M. Rose became aware of the Avon negotiations but only after Mattes came to New York in January. (Tr. 148:14-25.)

Indeed, the inconsistencies began here. For example, M. Rose later admitted to giving Mattes advice on what to say when discussing pricing with Avon. (Tr. 152.) Plaintiffs' Exhibit 49 showed an email between M. Rose and Mattes, where Mattes mentioned both Orly and Avon; however, M. Rose testified he never knew about a royalty arrangement between Orly and Mattes. (Tr. 153:2-4; 154:18-23; 155:1-2.) M. Rose denied Mattes' teaching of how to produce the nail polish as this technology was around for years. (Tr. 157:13-22.) M. Rose revealed that one of his

chemists, DeMayo was arrested. (Tr. 165:9-11; 170:15-16.) However, the next day on re-direct, M. Rose denied ever stating that DeMayo was arrested and rather, that he stated he was a thief. (Tr. 199:10-19.) H. Rose also confirmed that DeMayo was never arrested. (Tr. 227:6-8.) During his deposition, M. Rose stated that Amway was no longer a customer of Forsythe, a fact he admitted he could not confirm at trial (Tr. 174:5-18.)

### Corey Alan Ingber

Ingber is an attorney, who was Mattes' boyfriend at the time that Mattes first met with Defendants. (Tr. 204:14-25.) Ingber attended the meeting in January with Mattes. (Tr. 205:16-23.) He testified that at the meeting, conversations were had regarding the size of Forsythe, specifically that it was either a $35 or $40 million company. (Tr. 206:1-15.) In addition, the size of the company was compared to companies such as Avon and Orly. (*Id.* at 1-12.) Likewise, there was a discussion of an ongoing deal with Amway for Mattes' beads. (*Id.* at 16-19.) Ingber stated that H. Rose reaffirmed these statements during the meeting. (Tr. 209:22-25.) Ingber provided informal representation to Mattes during the January 2012 meeting but did not advise Mattes to request any financial documents after the meeting because he advised Mattes to hire a specialist to handle the negotiations and drafting of any agreements. (Tr. 212-14.)

### Defendant Harriet Rose

H. Rose started her company in 1979 with her husband. (Tr. 218:20-24.)  H. Rose is the mother of Matza and M. Rose. (Tr. 219; Plaintiffs' Exhibit 35 at 2.) Plaintiffs' Exhibit 35 was an article that described H. Rose's thirty plus years in the industry and that she was the President of Color Club. H. Rose was not aware of Mattes until the meeting in January. (Tr. 219:4-8.) At that meeting, H. Rose never confirmed that her company was worth 34 million. (Tr. 219:20-23.) All that H. Rose informed Mattes of was that Forsythe was capable of filling her orders as it is a

manufacturing company; however, H. Rose was not aware of what her orders were at the time. (Tr. 220:3-10.) Mattes did mention Orly when they met but was unable to discuss anything specific because she had signed a non-disclosure agreement with Orly. (Tr. 221:1-9.) Forsythe continued to sell Mattes' nail polish until the lawsuit occurred as documents were provided to stop selling these products. (Tr. 223.) H. Rose agreed that she was happy with the sales of the nail polish in 2013. (Tr. 225:21-25.) Mattes contributed of $300,000 towards Solar Club, LLC. (Tr. 228:17-20.) However, the $300,000 contribution was not a cash payment. (Tr. 239:21-25.) Later, on re-cross, H. Rose admitted that $300,000 was the fair market value of the license that was granted to MadMack by Solar Active. (Tr. 255-56.)

H. Rose clarified that Forsythe was a manufacturer, not a mixer as M. Rose stated. (Tr. 242.) Mattes never contacted H. Rose after the January 2012 meeting to discuss financials. (Tr. 243:1-12.) H. Rose never intended to mislead Mattes. (Tr. 243:13-15.) Mattes contacted Forsythe's accountant all the time. (Tr. 256:14-18.)

### *Whitney Matza*

Matza is legal counsel at Forsythe and managed accounts as well as the regulatory documents. (Tr. 258:8-17.) Matza reviewed Defendants' Exhibit 400, which was Forsythe's Cosmetic Group Accounts Receivable Invoice History Report. (Tr. 259.) Matza testified that Forsythe had a continuing commercial relationship with Access Business Group who is the sister company of Amway. (Tr. 260:2-7.) Forsythe was selling to Amway in 2012, 2013, and 2014 and the Amway account was still active as of early 2012. (Tr. 261-63.) Exhibit 400 only showed nail polish purchases but none of color changing beads. (Tr. 263:24-25; 264:1-5.) There was no evidence proffered that refuted the testimony of Matza concerning the Amway deals. Interestingly, Plaintiffs' Exhibit 42 illustrates that Mattes was invited to attend a meeting with

Amway in August 2012 with M. Rose but was not certain if she would have medical clearance to fly to New York for the meeting, so M. Rose offered to go alone. This was particularly important to the Court as one of the fraudulent statements alleged dealt with a current deal in place between Defendants and Amway.

### *Jeff Pink*

Pink is the President and CEO of Orly. (Tr. 269:8-10.) Pink entered into a non-disclosure agreement with Hatteras while exploring the possibility of manufacturing and selling the color changing nail polish. (Tr. 269:12-17.) Pink offered to manufacture the color changing nail polish and provide Mattes with a 20% royalty deal. (Tr. 272:12-16; 277:5-12.) This included manufacturing the Avon order (Tr. 272:17-19) -- that was in 2011 and 2012. (Tr. 273:1-7.) Pink stated that the pricing for the Avon order would be lower than his high-end products. (Tr. 276:3-6.) Pink confirmed that the royalty deal would be on sales, not net profit, and prior to taxes. (Tr. 280: 2-7.) Plaintiffs' Exhibit 56, which was an email between Orly's employee and Mattes, dated February 2, 2012, illustrated that the products were not yet FDA approved, and Pink confirmed that. (Tr. 296.)

### *Expert Witness Jay B. Abrams*

Abrams was hired as Plaintiffs' damages expert. (Tr. 321:11-13.) Abrams reviewed tax returns for the years 2013 and 2014 to determine if Forsythe was a $34 million company. (Tr. 322:17-20; 323:9-15.) Abrams was not provided with tax returns for the years of 2011 or 2012. (Tr. 323:16-22.) Abrams used the discounted cash flow analysis. (Tr. 326:4-8; 327:23-25.) Abrams discussed that under the income approach, there are two possible choices. (Tr. 327:14-17.) Specifically, Abrams used the discounted lost profits approach for the New York claims and the value destroyed for the California claim, which both are analyzed under the fair market

value. (Tr. 327:17-22.) For the California claim, Abrams found a loss of a little under 28 and a half million dollars. (Tr. 330:10-14.) Abrams used two scenarios to determine the weighted average present value of total damage calculation as of the end of 2022, which totaled $113,721,000, representing the loss business opportunity and future loss of income for the New York claims. (Tr. 357.) Abrams found the value of Mattes' business as of June 30, 2012, to be $14,666,000 because that was the inception of Solar Club at the time of purchase. (Tr. 362-63.) However, Abrams included prejudgment interest for destruction of the business, which totaled to the $28.46 million number. (Tr. 363-64.) Abrams did not use Orly's 20 percent royalty deal as a basis for any of his damage calculations. (Tr. 369.) Abrams based his calculation on an OPI proposed request for 5 million bottles of nail polish.  (Tr. 345-46.)  According to Abrams, the 5-million-bottle order was an example of the market demand for color changing nail polish.  (Tr. 346:12-14.)  Abrams did not use the Avon order into his calculations or figures. (Tr. 346:6-11.)

Abrams testified that Forsythe's sales for the 6-month period ending December 31, 2012, was $7,272,768 and sales for the 12-month period ending December 31, 2013, was $13,566,945. (Tr. 394.) Forsythe's sales for the period ending December 31, 2014, was $13,693,719.00 and for the period ending December 31, 2015, was $15,130,401.00.  (Tr. 395:12-17.) Abrams was never asked to provide a valuation of the Forsythe Cosmetic Group.  (Tr. 395:8-10.)

When Abrams calculated his lost profit damages, he considered that at a minimum, Mattes alone without the Forsythe transaction would at least have sold as much nail polish as Solar Club sold. (Tr. 377:14-21). Abrams also confirmed the companies that Mattes had as potential business opportunities such as Orly, Avon, and OPI. (Tr. 365:15-25 to Tr. 366, 1-2.) However, Abram's relied on statements from Mattes regarding potential business opportunities and to use certain indicators in determining sales. (Tr. 358:14-18; 335:10-25.)

The *critical date* is the *January 2012 meeting* (the "January Meeting"), and "who said what". It is at that meeting that the alleged misrepresentations forming the basis of all three fraud claims were made.  Testimony was heard by each alleged attendee from their point of view of what transpired, and who was in attendance. Their summaries are below:

| | |
|---|---|
| *Debra Mattes* | Mattes and her then-boyfriend Ingber went to meet with M. Rose in January of 2012. (Tr. 42.) There, she met Matza, H. Rose, and M. Rose. (*Id.*) At that Meeting, Mattes was told that Forsythe was a $34-million-dollar company, that Defendants would manufacture all that was needed, interest in an "50-50" partnership, and the Avon and Orly deals. (Tr. 43.) In addition, the Amway deal was discussed at this meeting and M. Rose had informed Mattes that the deal would be quite large. (Tr. at 93.) |
| *Michael Rose* | According to M. Rose, Mattes, Ingber, and H. Rose attended the January Meeting. (Tr. 141.) M. Rose was unsure if Matza had attended. (*Id.*)  The discussions related to doing business together and that Forsythe was a "fully integrated manufacturer." (*Id.*; Tr. 147.) However, M. Rose averred that no statement was ever made regarding a $34 million company. (Tr. 142:1-8; 198:4-6.) Likewise, M. Rose stated that H. Rose never made the above statement nor was there a discussion regarding a current deal with Amway. (Tr. 145.) It was unclear whether it was at the January Meeting, before or after, that M. Rose was informed of the Avon and Orly deals. (Tr. 147-48, 154.) |
| *Harriet Rose* | H. Rose was present at the January Meeting along with Mattes, Ingber and M. Rose. (Tr. 219.) She did not recall if a chemist joined that meeting but was certain that Matza was not present. (*Id.*) H. Rose testified that M. Rose did not tell Mattes that Forsythe was a 34-million-dollar company.  (*Id.*; Tr. 231-41, 44.) H. Rose did not know what orders were going to needed at the time of the meeting and simply informed Mattes that Forsythe was a manufacturer. (Tr. 219-20.) Nor was an Avon or Orly deal discussed as Mattes was not allowed to discuss Orly due to the signing of an NDA. (Tr. 220-21.) Orly was just briefly mentioned. (Tr. 221.) H. Rose also stated that she did not recall M. Rose informing Mattes of a 600,000-bead order with Amway. (Tr. 222.) |
| *Whitney Matza* | Matza was not questioned about the January Meeting by either party. (Tr. 258-64.) |
| *Corey Ingber* | Ingber recalls that M. Rose, H. Rose, Matza, and possibly a chemist, were at the January Meeting. (Tr. 205.) Discussions were had regarding the size of Forsythe, and he remembered that it was represented by M. Rose to be either 35 or 40 million. (Tr. 206-07.) It was likewise discussed by M. Rose that there was an existing order with Amway for a large order or Mattes' beads. (*Id.*) Ingber also stated that Mattes' deals with Avon and Orly were discussed. (Tr. 208.) H. Rose also represented the same information as M. Rose did. (Tr. 209.) |

Considering the trial testimony, the Court finds that the testimonies of all the witnesses with the exception of Ingber and M. Rose to be credible. M. Rose's testimony contained numerous inconsistencies. Ingber's prior personal relationship with Mattes provides motivation for bias and his testimony was of limited value. *See Quinton v. Am. Express Co.*, No. 19-CV-566 (NGG)(JRC), 2025 WL 1384896, at *10 (E.D.N.Y. May 13, 2025), *on reconsideration in part*, No. 19-CV-566 (NGG)(JRC), 2025 WL 1994848 (E.D.N.Y. July 17, 2025) (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias is a term … to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Proof of bias is almost always relevant … to assess all evidence which might bear on the accuracy and truth of a witness' testimony.")).

The testimony leads to the inescapable conclusion that the parties did in fact meet in January of 2012 to discuss potential business with each other. Based upon the conversations had in that meeting and the interactions that followed, a joint venture called Solar Club was created. There are two sides as to what was said at the meeting in connection with the size of Forsythe. Given the conflicting and credible testimonies, Plaintiffs failed to establish even by a preponderance of evidence that the size of Forsythe in the year of 2012 was definitely discussed. Yet, it became clear upon Matza's testimony that Forsythe was doing business with Amway during the relevant years in question. Indeed, Plaintiffs claim that the fraudulent inducement stemmed from two statements allegedly made by Defendants: (i) Forsythe was a $34 million company and the second largest nail polish company in the US and (ii) defendants had a large deal in place with Amway.

For arguments sake, assuming the statements were explicitly stated at the January Meeting, Plaintiffs nevertheless failed to establish reliance sufficient to satisfy that element

alone. Mattes was represented by counsel when entering into agreements with Defendants. (Tr. 54:1-5.) The fact that Mattes was not provided with any other financial documentation and with only projections, was enough for Mattes to go forward with the deal. (Tr. 55:6-23; 65:11-12.) Plaintiff did not do any independent research apart from asking Defendants for documentation as to size. (Tr. 50:9-13.) Indeed, when the Court asked whether not receiving documents to determine the size of Forsythe gave pause to Mattes, she testified "no" because the projections were given. (Tr. 50.)In other words, she took no further steps in an attempt to verify.

As time went on, business did not go as Mattes had planned. That is because once Mattes received financial documents (a K-1 report) she was displeased with the results, leading to the instant action. (Tr. 68:6-25; 67.) However, the unfavorable results do not equate to fraud committed by the Defendants. At the very least, the testimony elicited, and exhibits offered in evidence did not support the claim that Defendants intended to defraud Plaintiffs into entering a joint venture. With these findings in mind, the Court proceeds to its conclusions of law.

## III.    **CONCLUSIONS OF LAW**

As a threshold matter, this Court has subject matter jurisdiction based on diversity of citizenship and the amount in controversy exceeds the threshold requirement pursuant to 28 U.S.C. § 1332.[8] As described above, the parties are citizenships of different states, and the relief sought exceeds $75,000. (*See* ECF No. 64.) Moreover, this action was properly removed under 28 U.S.C. § 1441(b)[9] by Defendant M. Rose from the Superior Court County of Los Angeles to

---

[8] The relevant statute provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--citizens of different States …." 28 U.S.C. § 1332(a).

[9] Pursuant to 28 U.S.C. § 1441, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending. In determining whether a civil action is removable on the basis of the jurisdiction under section

the Central District of California. (*See* ECF No. 1.) Thereafter, due to a forum selection clause, the case was transferred to the Southern District of New York. (*See* ECF No. 17.) Following an Order to Show Cause (ECF No. 18), which neither party responded to, the case was transferred to the Eastern District of New York. (ECF Nos. 19-20.)

### A. *Choice of Law for Fraudulent Inducement and Aiding and Abetting Claims*

This Court has already determined that California law applies to Plaintiffs' California Corporations Code § 25401. [10]   *Hatteras Enters. Inc. v. Forsythe Cosm. Grp., Ltd.*, No. 15-CV-05887 (ADS) (ARL), 2018 WL 1935984, at *8-9 (E.D.N.Y. Apr. 23, 2018). Likewise, the Court also determined that the remaining fraudulent claims will be determined pursuant to New York law. *Id.* at *6. Nor do the parties dispute this as their proposed conclusions of law cite to that of New York law for such claims. (*See* ECF Nos. 169 at 19; 170 at 9.) As such, the Court will not disturb what has already been ruled upon.

---

1332(a) of this title, the citizenship of defendants sued under fictitious names shall be disregarded. A civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(a)-(b).

[10] The prior rulings are "law of the case". As the Hon. Arthur D. Spatt observed,

> "The 'law of the case' doctrine posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Sagendorf-Teal v. Cty. Of Rensselaer,* 100 F.3d 270, 277 (2d Cir. 1996) (quoting *DiLaura v. Power Authority of State of New York,* 982 F.2d 73, 76 (2d Cir. 1992)). "Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *In re PCH Associates,* 949 F.2d 585, 592 (2d Cir. 1991) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1981)).

*Hatteras Enters. Inc. v. Forsythe Cosmetic Group, Ltd.,* No. 15-CV-5887 (ADS)(ARL), 2016 WL 4083386, at *4 (E.D.N.Y. July 30, 2016); *see also Elisa W. v. City of New York*, No. 15-CV-5273 (JAV) (SLC), 2025 WL 1479191, at *5 (S.D.N.Y. May 22, 2025) ("This doctrine warns courts against revisiting prior rulings in later stages of the same action—which is precisely what Plaintiffs seek to do—absent compelling reasons or the need to correct a manifest injustice.")

### *1. Fraudulent Inducement*

A claim of fraudulent inducement under New York law, requires proof of the following elements: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Hatteras Enters., Inc. v. Forsythe Cosm. Grp., Ltd.*, No. 15-CV-5887 (GRB) (JMW), 2022 WL 3682270, at *11 (E.D.N.Y. Aug. 25, 2022) (citing *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006)).

"Under New York law, the essential elements of a fraud claim include 'representation of a material existing fact, falsity, scienter, deception, and injury.'" *Cargo Logistics Int'l, LLC*, 723 F. Supp. 3d at 226 (quoting *Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 400 (2d Cir. 2001) (quoting *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995)). In other words, the second element of fraud in New York is intent to defraud, or scienter, which includes knowledge of the falsity of the representation." *Id.* (quoting *GEM Advisors, Inc. v. Corporación Sidenor, S.A.*, 667 F. Supp. 2d 308, 333 (S.D.N.Y. 2009).

In addition, for element five, resulting damages, "New York law does not permit recovery of lost profits for a fraudulent inducement claim; a plaintiff may only recover actual pecuniary losses." *JGV Apparel Grp., LLC v. Abu*, No. 22-CV-9210 (GHW) (JLC), 2024 WL 2093046, at *7 (S.D.N.Y. May 8, 2024); *see also Syncora Guar. Inc. v. Countrywide Home Loans, Inc.,* 935 N.Y.S.2d 858, 869 (N.Y. Sup. Ct. 2012) ("Compensatory damages are intended to make the victim of wrongdoing whole" or otherwise "compensate the injured party for its losses."); *Lama Holding Co. v. Smith Barney Inc.,* 668 N.E.2d 1370, 1373 (N.Y. 1996) (stating that damages awarded on a fraudulent inducement claim includes "indemnity for the actual pecuniary loss

sustained as the direct result of the wrong" and plaintiffs cannot recover for profits that would have been realized).

Moreover, to establish a claim for fraud in the inducement or fraudulent concealment, plaintiff must allege facts to support the claim that it *justifiably relied* on the alleged misrepresentations. "[I]f the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations." *ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921, 922 (N.Y. 2015) (quoting *Schumaker v. Mather,* 30 N.E. 755 (1892) (citing 931 N.E.2d 87, 91–92 (N.Y. 2010)); *see also Equinox Gallery Ltd. v. Dorfman*, 306 F. Supp. 3d 560, 577–78 (S.D.N.Y. 2018) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.,* 343 F.3d 189, 195 (2d Cir. 2003) (When determining a plaintiff's reasonable reliance, the court "consider[s] the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.")).

New York "takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision." *Learning Experience Sys., LLC*, 2023 WL 5835034, at *20 (citing *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) (discussing that parties negotiated through counsel and stating, "there [was] no issue of material fact as to whether Plaintiffs' reliance on any false representation was reasonable.")).

The fraudulent inducement claim is in connection with two specific statements allegedly made: (i) the size of Defendants' company and (ii) the deal in place with Amway. (*See* ECF No. 111 at 35.) The statements – addressed above – are analyzed separately.

### a. *$34 Million Dollar Company*

The statement that "Forsythe was a $34-million-dollar company" was allegedly uttered during the January Meeting. Based on the testimony given, Mattes was misrepresented by M. Rose that Forsythe was a $34-million-dollar company. (Tr. 43:1-2.) Ingber corroborated this through his testimony. (Tr. 206:1-6.) In addition, Mattes stated that she relied on this statement because no financial records were ever provided to her until she was able to finally see tax statements in 2013. (Tr. 49-50, 55,68-69.) However, M. Rose and H. Rose testified that no statement was ever made. (Tr. 142:1-2; 198:4-6; 241; 219:20-23.) This is a prime example of "he said, she said." That does not rise to the level of evidence necessary to satisfy the clear and convincing standard for fraud.

Moreover, Mattes' testimony that she relied on statement regarding the size of Forsythe is not reasonable. Mattes had counsel assisting her (Tr. 54:1-5), she was provided with projections (Tr. 55:6-23), which she likewise relied on (Tr. 64; 65:1-13), and was a successful businesswoman who worked with major brands such as Nike (Tr. 22, 119). Mattes admitted that she did independent research on Defendants. She stated she conducted searches "on the internet … looked up their houses … what kind of lifestyle they had. … They were in nail magazines." (Tr. 49:1-9.) Importantly, when asked whether not receiving documents to determine the size of Forsythe gave pause to Mattes, she testified no because the projections were given. (Tr. 50.) Shortly thereafter, Mattes stated that she relied on the projections to move forward with the deal.

(Tr. 65:11-13.) H. Rose also testified that after the January Meeting, Mattes never asked for any financial documents. (Tr. 243:2-12.)

"A party cannot claim reliance on a misrepresentation when he or she could have discovered the truth with due diligence." *Goldberg v. KOSL Bldg. Grp., LLC*, 231 N.Y.S.3d 531, 533–34 (N.Y. App. Div. 2d Dep't 2025) (collecting cases) (finding that "plaintiffs failed to allege reasonable reliance upon the defendants' alleged misrepresentations, which pertained to facts the plaintiffs could have verified with due diligence.") Thus, Mattes made a decision not solely based on what was stated at the January Meeting. *See Ross v. Gidwani*, 850 N.Y.S.2d 567, 568 (N.Y. App. Div. 2d Dep't 2008) ("Reliance is an essential element of a cause of action alleging fraud"); *see also Crigger*, 443 F.3d at 234 (discussing that a plaintiff may rely on a defendant's facts when "no independent means of ascertaining the truth" are available).

Moreover, the record is devoid of *any intent* on behalf of M. Rose when making this statement. H. Rose also testified that she never intended to mislead Mattes. (Tr. 243:16-22.) Nor did Mattes testify that this statement was made with knowledge of falsity. Mattes, a sophisticated businesswoman had dealt with different companies and individuals. (Tr. 22, 119.) As previously stated, Plaintiffs were also represented by counsel when conducting the transaction. (Tr. 53-54.) While it is true that Abrams testified that Plaintiffs did have their company destroyed by the alleged fraud (Tr. 363-64), Plaintiffs have failed to establish by *clear and convincing* evidence that M. Rose's statement to Mattes fraudulently induced her into the joint venture.

Therefore, all five elements have not been met.

### b. *Deal with Amway*

Mattes testified that during the January Meeting, she was told that there was a large Amway deal. (Tr. 91:24-25.) Plaintiffs claim that statement was a misrepresentation. However,

Matza's testimony established that Defendants did in fact have a deal with Amway during the time in question. (Tr. 259-63.) As Matza managed the accounts for Forsythe, she testified that Defendants' Exhibit 400 showed an invoice with the Access Business Group, a sister company of Amway and that Forsythe was selling to Amway in the year 2012 through 2014. (Tr. 259; 260:2-7; 261-63.) As such, there was no evidence that a material misrepresentation occurred and the first element for fraudulent inducement was not proven by clear and convincing evidence. Rather, no evidence was submitted to refute Matza's testimony that the Court found to be credible. Therefore, the statement that there was a large deal with Amway was not false.

Accordingly, the claim of fraudulent inducement fails.

## 2. *Aiding and Abetting Fraud*

The elements of an aiding-and-abetting-fraud claim brought under New York law are: (1) an underlying fraud; (2) the defendant's actual knowledge of the fraud; and (3) the defendant's substantial assistance to the fraud. *See Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (N.Y. App. Div. 1st Dep't 2010); *Krys v. Pigott*, 749 F.3d 117, 126-27 (2d Cir. 2014). Because at trial "[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence[,] ... Plaintiffs must have adduced sufficient evidence to meet this standard at trial." *de Abreu v. Bank of Am. Corp.*, 812 F.Supp.2d at 322 (internal citations omitted); *Silvercreek Mgmt., Inc.*, 346 F. Supp. 3d at 482 (same).

Plaintiffs have not satisfied the first element. As no underlying fraud was found above, the claim for aiding and abetting fails.

## 3. *Securities Fraud under Cal. Corp. Code § 25401*

California law applies because "there is no conflict between California and New York's blue sky laws [since] 'New York has no interest in precluding claims like those brought by the

plaintiff[.]'" *Hatteras Enters., Inc.*, 2022 WL 3682270, at *15 (quoting *Hatteras Enterprises Inc.*, 2018 WL 1935984, at *9 (citing *Fed. Hous. Fin. Agency v. Deutsche Bank AG*, 903 F. Supp. 2d 285, 291 (S.D.N.Y. 2012)). Pursuant to Cal. Corp. Code § 25401,

> [i]t is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact or omits to state a material fact necessary to make the statements made, in the light of the circumstances under which the statements were made, not misleading.

Cal. Corp. Code § 25401.

> Cal. Corp. Code § 25501 likewise states that,

> [a]ny person who violates Section 25401 shall be liable to the person who purchases a security from, or sells a security to, that person, who may sue either for rescission or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security), unless the defendant proves that the plaintiff knew the facts concerning the untruth or omission or that the defendant exercised reasonable care and did not know (or if the defendant had exercised reasonable care, would not have known) of the untruth or omission.

Cal. Corp. Code § 25501.

The definition of "security" under Cal. Corp. Code § 25019 is broad and includes an "interest in a limited liability company and any class or series of those interests (including any fractional or other interest in that interest), except a membership interest in a limited liability company in which the person claiming this exception can prove that all of the members are actively engaged in the management of the limited liability company[.]" Cal. Corp. Code § 25019.

A plaintiff must satisfy the following elements to be successful on a Cal. Corp. Code § 25401 claim: (i) a stock was purchased, (ii) in California, and (iii) "by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading." *MTC Elec. Techs. Co. v. Leung*, 876 F. Supp. 1143, 1147 (C.D. Cal. 1995); *Hardisty*

*v. Moore*, 6 F. Supp. 3d 1044, 1064 (S.D. Cal. 2014) (same); *Feller v. Petty*, No. 18-CV-03460 (KS), 2024 WL 4008712, at *23 (C.D. Cal. Aug. 29, 2024) (same). "Among the elements of such a cause of action are that the defendant has made an untrue representation as to a past or existing *material* fact." *Ins. Underwriters Clearing House, Inc. v. Natomas Co.*, 228 Cal. Rptr. 449, 453 (Cal. Ct. App. 1986) (emphasis in original).

Importantly, § 25501 has a requirement of privity between the parties. *See Apollo Cap. Fund, LLC v. Roth Cap. Partners, LLC*, 70 Cal. Rptr. 3d 199, 221 (Cal. App. Ct. 2007) (finding no privity existed between the parties and thus, no civil liability attached); *see also Feller*, 2024 WL 4008712, at *24 (citing *Moss v. Kroner*, 197 Cal. App. 4th 860, 874 (Cal. App. Ct. 2011) ("Claims for primarily liability under Sections 25401 and 25501 require strict privity between buyer and seller.")). However, "California law does not require strict privity 'for secondary liability suits alleging joint and several liability for a violation of section 25401 by means of section 25504 and/or 25504.1.'" *Id.*; *SIC Metals, Inc. v. Hyundai Steel Co.*, No. 18-CV-00912(CJC) (PLAX), 2018 WL 6842958, at *5 (C.D. Cal. Nov. 14, 2018) (quoting *Colman v. Theranos, Inc.*, 2017 WL 1383717, at *1 (N.D. Cal. Apr. 18, 2017) ("Courts consistently hold that 'California Corporations Code § 25401 is limited to a suit by the buyer against the seller.' [H]owever, a 'person who materially assists' a violation of section 25401 'with intent to deceive or defraud' can be held jointly and severally liable for that violation.")).

"Under both state and federal securities law, [a] fact is material if there is a substantial likelihood that, under all the circumstances, a reasonable investor would consider it important in reaching an investment decision." *People v. Butler*, 151 Cal. Rptr. 3d 352, 367 (Cal. Ct. App. 2012) (internal citations and quotations omitted); *see also Hatteras Enters., Inc.*, 2022 WL 3682270, at *16 ("California courts have imposed a reasonableness requirement on the

materiality element of a § 25401 claim.") "Actual reliance occurs when the defendant's misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when absent such representation, the plaintiff would not, in all reasonable probability, have entered into the transaction." *Feller*, 2024 WL 4008712, at *24 (quoting *Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 519 (2004)). However, "Sections 25401 and 25501 differ from common law fraud in that plaintiff need not show reliance, causation or scienter." *Esebag v. Whaley*, No. 18-CV-08446 (JAK)(RAOX), 2020 WL 7414734, at *5 (C.D. Cal. Sept. 8, 2020) (citing *Bowden v. Robinson*, 67 Cal. App. 3d 705, 715 (1977) ("proof of reliance and causation is not required under sections 25401 and 25501")).

Here, there is no dispute that MadMack's interest in Solar Club was a security. *See Hatteras Enters., Inc*, 2022 WL 3682270, at *15 (summary judgment). The question remains whether Plaintiff has proven by a preponderance of the evidence that the sale of the security was due to a fraudulent statement. *See Liodas*, 562 P.2d at 324 ("the plaintiff has failed to carry his burden of proving the fact of fraud by a preponderance of the evidence").

Defendants assert that no privity exists between MadMack and any Defendant, a prerequisite to impose civil liability. (*See* ECF No. 170 at 13-15.) It is undisputed that Solar Club was established by the parties when entering into the joint venture. (*See* Plaintiff's Exhibit 2.) Mattes, the manager of MadMack contributed $300,000 to Solar Club, and the two members of Solar Club were Defendant Trust and Plaintiff MadMack. (Tr. 228:17-20; 254:7-10.) H. Rose also admitted that Forsythe was "managing the entire Solar Club." (Tr. 224:18-19.) *Au fond*, privity existed between the parties, as the buyer and seller were Plaintiffs and Defendants.

Even with privity established, the fraudulent misrepresentations are absent. The statement regarding the deal with Amway was proven to be true by Matza and Plaintiffs did not provide

any evidence to show otherwise. (Tr. 261-63.) As for the size of Forsythe, Plaintiffs and Defendants had differing versions of what was said at the January Meeting. (*See* January Meeting Chart above.)  Moreover, while reliance is not required for this claim, materiality is. *See Butler*, 151 Cal. Rptr. 3d at 367. A statement regarding the size of Forsythe could logically be material for a reasonable investor when deciding to enter into a joint venture, if no other information was available. Yet, Mattes affirmed that she did independent research on Defendants. (Tr. 49:1-9), Mattes received projections (Tr. 64-65) and was not unfamiliar to the business world following her prior business deals (Tr. 22, 119). Mattes admitted that despite the lack documentation as to the size of Forsythe, she moved forward with the deal due to the projections provided by Defendants. (Tr. 50.) Indeed, Mattes relied on the projections. (Tr. 65:11-13.) Therefore, under all the circumstances, Mattes could not consider the statement of the size of Forsythe material. *See Ins. Underwriters Clearing House, Inc*, 228 Cal. Rptr. at 453 (emphasis added) ("A fact is material if there is a substantial likelihood that, *under all the circumstances*, a reasonable investor would consider it important in reaching an investment decision.")

Accordingly, Plaintiffs did not prove by a preponderance of the evidence that the misrepresentations were made at the January Meeting.

### 4. *Counterclaims*

Defendants assert that the three counterclaims for (i) breach of contract against MadMack, and (ii) the two unjust enrichment claims against MadMack are brought by Forsythe and were asserted prior to the filing of the bankruptcy so they "are likely preserved." (ECF No. 170 at 17.) Whereas Plaintiffs assert that because Forsythe filed for bankruptcy, they are "no longer a Defendant in this case." (ECF No. 169 at 3.) In addition, Plaintiffs aver that the

counterclaims were also brought on behalf of the other Defendants and Plaintiffs are entitled to judgment in their favor on the counterclaims. (ECF No. 169 at 24.)

A review of the counterclaims demonstrates that at least one of the claims (First Counterclaim) is not only brought by Forsythe. Notably, all counterclaims are entitled as "Defendants'" counterclaims. (See ECF No. 68 at 12-14.) The first counterclaim appears to be brought by all Defendants as the language reads "[a]s a result of the breach of the agreements by plaintiff Madmack, LLC, Defendants have been forced to retain and pay attorneys who otherwise would not have been needed. To date, Defendants have paid approximately $103,000 on attorneys' fees related to this litigation and that amount continues to increase. Defendants are entitled to the return of all fees and expenses paid or to be paid to defend this case." (*Id.* at ¶ 112.) The second counterclaim appears to be brought only by Forsythe as the language reads "[a]ccording to the Operating Agreement, Forsythe is entitled to be paid its management fees prior to any distributions to members." (*Id.* at ¶ 115.) As for the last counterclaim, it reads "[b]y failing to pay for 50% of the expenses incurred by Forsythe Cosmetic Group, Ltd., Plaintiffs have been unjustly enriched in an amount to be proven at trial, but in excess of $34,037." (*Id.* at ¶120.)

Notwithstanding these counterclaims pleaded in the Answer, there was a paucity – indeed no – proof offered at trial to support the counterclaims. Therefore, at the conclusion of trial, Defendants were directed address whether the counterclaims should have been part of the case, whether they are abandoned or otherwise stayed. (Tr. 402:13-20.) Defendants did not address whether evidence was provided throughout trial or that these counterclaims are abandoned. Rather, Defendants now contend that as the counterclaims were asserted prior to bankruptcy filing, such claims "are likely preserved." (ECF No. 170 at 17.) Put simply, Defendants provide a

blanket statement without no support and the Court finds no evidence was adduced at trial as to these claims.

Importantly, "Section 362(a) of Title 11 of the United States Code stays the commencement or continuation of virtually all proceedings against a debtor, including enforcement of judgments, that were or could have been commenced before the debtor filed for bankruptcy." *S.E.C. v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000); *see also Eletson Holdings, Inc. v. Levona Holdings Ltd.*, 731 F. Supp. 3d 531, 592–93 (S.D.N.Y. 2024) (internal citations omitted) ("'The general purpose' underlying the provision 'is to grant complete, immediate, albeit temporary relief to the debtor from creditors, and to prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected.'")

The clear language of the Bankruptcy Code illustrates that claims *against a debtor* are stayed – not those that the debtor brings itself –i.e., affirmative claims. *See Beyond Bespoke Tailors, Inc. v. Barchiesi*, No. 20-CV-5482 (VSB), 2025 WL 449295, at *2 (S.D.N.Y. Jan. 21, 2025) (internal citations omitted) ("Section 362 … means that 'the automatic stay provision of Section 362 by its terms only stays proceedings against the debtor, and does not address actions brought by the debtor which would inure to the benefit of the bankruptcy estate.' … As relevant here, the automatic stay under Section 362 does not apply to either Debtor's third-party claims or counterclaims.") As such, the counterclaims are <u>not</u> preserved by Forsythe, and they are therefore dismissed.

## **CONCLUSION**

For the foregoing reasons, the Clerk of the Court is directed to enter judgment in favor of Defendants on Counts Seven (fraudulent inducement), Eight (securities fraud under Cal. Corp. Code § 25401), and Fourteen (aiding and abetting fraud) of the Amended Complaint (ECF No. 64) and also dismissing the Counterclaims (ECF No. 68). The Clerk of the Court is respectfully directed to close out the case.

Dated:  Central Islip, New York
October 28, 2025

S O   O R D E R E D:

/S/ *James M. Wicks*

JAMES M. WICKS
United States Magistrate Judge
